HAMPTON, JR., & CO. *v.* UNITED STATES (No. 2761)[1]

1. STATUTORY CONSTRUCTION—CONSTITUTIONAL LAW—PRESUMPTION.

In considering constitutional objections to a statute, it is the court's duty to entertain every reasonable presumption in favor of its validity, and to ascertain and give effect to the legislative will if possible.

2. CONSTITUTIONAL LAW—TRIPARTITE GOVERNMENT—DELEGATION OF LEGISLATIVE AND TAXING POWER—CONFERRING OF FACT-FINDING POWER.

No principle is more vital to our national perpetuity, more zealously guarded by our courts, or more earnestly adhered to by our people than the continuance of the integrity and independence of the three departments of our Government—the Legislative, the Executive, and the Judicial. An attempt by the Congress to delegate to the President its power to legislate and fix rates of duties on imports would be unconstitutional. While an act of Congress which would confer upon the President the power to make a law or levy a tax would be an unconstitutional attempt to delegate the legislative or taxing power, an act making the law or levying the tax and conferring upon him the power to find the facts upon which its going into effect would depend would not be.

3. CONSTITUTIONAL LAW—TAXING POWER—PROTECTIVE TARIFF—MOTIVES OF LEGISLATIVE.

A tax may be imposed for raising revenue and also for the accomplishment of some other purpose thought to be for the public welfare. In such case the Judiciary will not inquire into the motives of the Legislative and hold the law unconstitutional as the levying of a tax for another purpose than the raising of revenue.

4. EXECUTIVE'S POLITICAL AND MINISTERIAL ACTS—JUDICIARY.

In the exercise of political functions the Executive is not responsible to the Judiciary but to the people. Where, however, the Legislative has constituted him an agent for the execution of some policy involving personal and property rights, his acts are ministerial only, and are subject to review by the courts.

5. JUDICIAL LEGISLATION.

Whether or not a law is wise is not for the Judiciary but for the Legislative. The cure for unwise exercise of constitutional power by the Legislative is with the people.

6. CONSTITUTIONAL LAW—ESTABLISHED PRACTICE—PROTECTIVE TARIFF.

While established practice can not render constitutional that which is unconstitutional, the fact that for 138 years a legislative policy of tariff protection of the industries of the United States from foreign competition has persisted continuously and consistently, unchallenged and apparently with the approval of the people, must be given great weight in determining the constitutionality of such legislation.

7. CONSTITUTIONAL LAW—CONGRESSIONAL REGULATION OF COMMERCE.

The power granted by the Constitution to Congress to regulate commerce "among the several States" includes the right to prohibit when the public welfare requires it; but the power to "regulate commerce with foreign nations" includes the *absolute* right to levy discriminatory duties and to prohibit.

---

[1] T. D. 42030.

8. CONSTITUTIONAL LAW—DELEGATION OF LEGISLATIVE AND TAXING POWERS—
PROTECTIVE TARIFF—REGULATION OF FOREIGN COMMERCE—ARTICLE I,
SECTIONS 1 AND 8, CONSTITUTION OF THE UNITED STATES—SECTION 315,
TARIFF ACT OF 1922, "FLEXIBLE TARIFF."

Section 315, Tariff Act of 1922, the "flexible tariff" provision, directs the
President, in a carefully prescribed manner, to ascertain whether or not the
classifications and rates of the act are proper for the protection of the indus-
tries of the United States from foreign competition, and, if not, to change
them, within carefully prescribed limitations and upon carefully prescribed
conditions, enough to make them so. It is not unconstitutional as an attempt
by the Congress to delegate to the President the legislative or taxing power
conferred on it by Article I, sections 1 and 8, respectively, of the Constitution.
It is a valid conferring on him of the power to find the facts upon which the
going into effect of the law depends. The injunctions, restrictions, limita-
tions, and conditions imposed by the section upon the President are sufficiently
accurate and precise to make his action in accord with them a definite and
certain execution of the legislative will; and whether or not his action accords
with them is within the power of the Judiciary to determine. The fact that,
in addition to the raising of revenue, it intends to, and does, protect the indus-
tries of the United States from foreign competition does not put it beyond
the power granted to the Congress by Article I, section 8, of the Constitution
"to lay and collect taxes, duties, imposts, and excises, to pay the debts and
provide for the common defense and general welfare of the United States."
It is a valid exercise of the power granted to Congress by Article I, section 8,
of the Constitution "to regulate commerce with foreign nations."

## United States Court of Customs Appeals, February 24, 1927

APPEAL from Board of United States General Appraisers, G. A. 9116, T. D. 41478.

[Affirmed.]

*Walter Evans Hampton* for appellant.

*Charles D. Lawrence*, Assistant Attorney General (*Marion De Vries*, special
assistant to the Attorney General, of counsel), for the United States.

*Charles F. Kingsley*, amicus curiae.

[Oral argument October 6, 1926, by Mr. Hampton, Mr. Kingsley, Mr. Lawrence, and Mr. De Vries]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD,
Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The Tariff Act of 1922 contains the following duty provision:

12. Barium carbonate, precipitated, 1 cent per pound; barium chloride, 1¼
cents per pound; barium dioxide, 4 cents per pound; barium hydroxide, 1¼
cents per pound; and barium nitrate, 2 cents per pound.

That act also contains the following administrative provision:

SEC. 315. (a) That in order to regulate the foreign commerce of the United
States and to put into force and effect the policy of the Congress by this act
intended, whenever the President, upon investigation of the differences in
costs of production of articles wholly or in part the growth or product of the
United States and of like or similar articles wholly or in part the growth or prod-
uct of competing foreign countries, shall find it thereby shown that the duties
fixed in this act do not equalize the said differences in costs of production in the

United States and the principal competing country he shall, by such investigation, ascertain said differences and determine and proclaim the changes in classifications or increases or decreases in any rate of duty provided in this Act shown by said ascertained differences in such costs of production necessary to equalize the same. Thirty days after the date of such proclamation or proclamations such changes in classification shall take effect, and such increased or decreased duties shall be levied, collected, and paid on such articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands, the Virgin Islands, and the islands of Guam and Tutuila) : *Provided*, That the total increase or decrease of such rates of duty shall not exceed 50 per centum of the rates specified in Title I of this Act, or in any amendatory Act.

(b) That in order to regulate the foreign commerce of the United States and to put into force and effect the policy of the Congress by this act intended, whenever the President, upon investigation of the differences in costs of production of articles provided for in Title I of this Act, wholly or in part the growth or product of the United States and of like or similar articles wholly or in part the growth or product of competing foreign countries, shall find it thereby shown that the duties prescribed in this Act do not equalize said differences, and shall further find it thereby shown that the said differences in costs of production in the United States and the principal competing country can not be equalized by proceeding under the provisions of subdivision (a) of this section, he shall make such findings public, together with a description of the articles to which they apply, in such detail as may be necessary for the guidance of appraising officers. In such cases and upon the proclamation by the President becoming effective the ad valorem duty or duty based in whole or in part upon the value of the imported article in the country of exportation shall thereafter be based upon the American selling price, as defined in subdivision (f) of section 402 of this Act, of any similar competitive article manufactured or produced in the United States embraced within the class or kind of imported articles upon which the President has made a proclamation under subdivision (b) of this section.

The ad valorem rate or rates of duty based upon such American selling price shall be the rate found, upon said investigation by the President, to be shown by the said differences in costs of production necessary to equalize such differences, but no such rate shall be decreased more than 50 per centum of the rate specified in Title I of this Act upon such articles, nor shall any such rate be increased. Such rate or rates of duty shall become effective fifteen days after the date of the said proclamation of the President, whereupon the duties so estimated and provided shall be levied, collected, and paid on such articles when imported from any foreign country into the United States or into any of its possessions (except the Philippine Islands, the Virgin Islands, and the islands of Guam and Tutuila). If there is any imported article within the class or kind of articles, upon which the President has made public a finding, for which there is no similar competitive article manufactured or produced in the United States, the value of such imported article shall be determined under the provisions of paragraphs (1), (2), and (3) of subdivision (a) of section 402 of this Act.

(c) That in ascertaining the differences in costs of production, under the provisions of subdivisions (a) and (b) of this section, the President, in so far as he finds it practicable, shall take into consideration (1) the differences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in

competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3) advantages granted to a fore·gn producer by a fore·gn government, or by a person, partnership, corporation, or association in a foreign country; and (4) any other advantages or disadvantages in competition.

Investigations to assist the President in ascertaining differences in costs of production under this section shall be made by the United States Tariff Commission, and no proclamation shall be issued under this section until such investigation shall have been made.  The commission shall give reasonable public notice of its hearings and shall give reasonable opportunity to parties interested to be present, to produce evidence, and to be heard.  The commission is authorized to adopt such reasonable procedure, rules, and regulations as it may deem necessary.

The President, proceeding as hereinbefore prov·ded for in proclaiming rates of duty, shall, when he determines that it is shown that the differences in costs of production have changed or no longer exist which led to such proclamation, accordingly as so shown, modify or terminate the same.  Nothing in this section shall be construed to authorize a transfer of an article from the dutiable list to the free list or from the free list to the dutiable list, nor a change in form of duty.  Whenever it is provided in any paragraph of Title I of this Act, that the duty or duties shall not exceed a specified ad valorem rate upon the articles provided for in such paragraph, no rate determined under the provision of this section upon such articles shall exceed the maximum ad valorem rate so specified.

(d) For the purposes of this section any coal-tar product provided for in paragraphs 27 or 28 of Title I of this Act shall be considered similar to or competitive with any imported ccal-tar product which accomplishes results substantially equal to those accomplished by the domestic product when used in substantially the same manner.

(e) The President is authorized to make all needful rules and regulations for carrying out the provisions of this section.

(f) The Secretary of the Treasury is authorized to make such rules and regulations as he may deem necessary for the entry and declaration of imported articles of the class or kind of articles upon which the President has made a proclamation under the provisions of subdivision (b) of this section and for the form of invoice required at time of entry.

On May 19, 1924, the President, claiming to act under and by authority of said section 315, issued the following proclamation, which was thereafter duly published.  T. D. 40216, 45 Treas. Dec. 669, to wit:

A PROCLAMATION

Whereas in and by section 315 (a) of Title III of the act of Congress approved September 21, 1922, entitled "An act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes," it is, among other things, provided that whenever the President, upon investigation of the differences in costs of production of articles wholly or in part the growth or product of the United States and of like or similar articles wholly or in part the growth or product of competing foreign countries, shall find it thereby shown that the duties fixed in this act do not equalize the said differences in cost of production in the United States

and the principal competing country he shall, by such investigation, ascertain said differences and determine and proclaim the changes in classifications or increases or decreases in rates of duty provided in said act shown by said ascertained differences in such costs of production necessary to equalize the same;

Whereas in and by section 315 (c) of said act it is further provided that in ascertaining the differences in costs of production, under the provisions of subdivisions (a) and (b) of said section, the President, in so far as he finds it practicable, shall take into consideration (1) the differences in conditions in production, including wages, costs of material, and other items in costs of production of such or similar articles in the United States and in competing foreign countries; (2) the differences in the wholesale selling prices of domestic and foreign articles in the principal markets of the United States; (3) advantages granted to a foreign producer by a foreign government, or by a person, partnership, corporation, or association in a foreign country; and (4) any other advantages or disadvantages in competition;

Whereas, under and by virtue of said section of said act, the United States Tariff Commission has made an investigation to assist the President in ascertaining the differences in costs of production of and of all other facts and conditions enumerated in said section with respect to the article described in paragraph 12 of Title I of said tariff act of 1922, namely, barium dioxide, being wholly or in part the growth or product of the United States, and of and with respect to a like or similar article wholly or in part the growth or product of competing foreign countries;

Whereas in the course of said investigation a hearing was held, of which reasonable public notice was given and at which parties interested were given a reasonable opportunity to be present, to produce evidence, and to be heard;

And whereas the President upon said investigation of said differences in costs of production of said article wholly or in part the growth or product of the United States and of the like or similar article wholly or in part the growth or product of competing foreign countries, has thereby found that the principal competing country is Germany and that the duty fixed in said title and act does not equalize the differences in costs of production in the United States and in said principal competing country, namely, Germany, and has ascertained and determined the increased rate of duty necessary to equalize the same.

Now, therefore, I, Calvin Coolidge, President of the United States of America, do hereby determine and proclaim that the increase in the rate of duty provided in said act shown by said ascertained differences in said costs of production necessary to equalize the same is as follows:

An increase in said duty on barium dioxide (within the limit of total increase provided for in said act) from 4 cents per pound to 6 cents per pound.

In witness whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the city of Washington this nineteenth day of May in the year of our Lord one thousand nine hundred and twenty-four, and of the independence of the United States of America the one hundred and forty-eighth.

[SEAL.]	CALVIN COOLIDGE.

By the President:
  CHARLES E. HUGHES,
    *Secretary of State.*

On June 19, 1924, the appellant imported at the port of New York 292 drums of barium dioxide, which was duly classified for, and assessed with, duty by the collector at 6 cents per pound, in accordance with the aforesaid proclamation of the President. Against this action by the collector, the importer duly filed its protest, alleging therein that the goods were properly dutiable at 4 cents per pound. as fixed by paragraph 12 of said Tariff Act of 1922, that said section 315 was and is unconstitutional, and that all acts pretended to be done thereunder by the President were null and void. This protest was, in due course, referred by the collector to the Board of General Appraisers, and the board, General Appraiser Brown dissenting. overruled the protest and sustained the assessment by the collector. Following the judgment resulting therefrom, the appellant has brought the cause to this court for review.

Many assignments of error are made. These, however, we think may be expressed in three propositions, namely:

First. Said section 315 is unconstitutional in that it attempts to delegate to the President the power to legislate, a power which can be exercised only by the Congress under Article I, section 1, of the Constitution:

SEC. 1. All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.

Second. Said section 315 is unconstitutional in that it attempts to delegate to the President the power to tax, a power which can be exercised only by the Congress under Article I, section 8, of the Constitution:

SEC. 8. The Congress shall have power to lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States;

Third. Said section 315 is a provision, not for a tax, duty, or excise, but solely for the protection of industries of the United States; and the Congress may not, under the powers given it by the Constitution, so legislate.

It is conceded by the parties that all acts of the President and other officials in the levying of the duty herein have been in conformity with the letter of said section 315.

These propositions will be dealt with as stated.

In considering these matters, certain cardinal principles of interpretation will be borne in mind: First, it is the duty of this court to attempt to ascertain the legislative will, as expressed in the act before us, and to give it effect, if possible; second, every reasonable presumption must be entertained in favor of the validity of the act in question. *Adkins* v. *Children's Hospital*, 261 U. S. 525, 544.

On December 6, 1921, the President of the United States, in his annual message to the Congress, called attention to the unsettled international conditions brought about by the World War, and recommended the creation of some legislative machinery whereby customs duties might be made more flexible, to meet such rapidly changing conditions and to prevent the undermining of our national industries. Cong. Rec., vol. 62, pt. 1, p. 37. On August 10, 1922, the Committee on Finance of the Senate presented through its chairman, Mr. McCumber, an amendment to H. R. 7456, then pending before the Senate, which, amended, became ultimately said section 315. From the remarks of Mr. McCumber on the floor of the Senate while presenting said amendment (Cong. Rec., vol. 62, pt. 11, pp. 11152–11160) and from the report of the Senate Committee on Finance (S. Rept. No. 595, 67th Cong., 2d sess.), it appears that said section 315 was intended to meet the suggestions made by the President in his said message and to provide a method of protecting the industries of the United States during the period of world-wide economic disturbance following the World War.

Section 315 is, obviously, framed to meet these desired ends. In brief, it provides:

(a) If the President shall find that the duties fixed in the Tariff Act of 1922 do not equalize the differences in costs of production in the United States and the principal competing countries, he shall ascertain the differences and determine and proclaim changes in classifications or increases or decreases in the rates of duty provided by the act sufficient to equalize the said differences in costs of production; but the total increases or decreases shall not exceed 50 per centum of the rates provided in the act.

(b) If the President finds, as to any articles, that he can not equalize said costs of production under (a), he shall so proclaim, together with a description of the articles to which the proclamation applies; and thereafter the ad valorem duties on such articles shall be based upon their American selling price. These ad valorem rates shall be sufficient to equalize said costs of production, but shall not be decreased more than 50 per centum of the rates named in the act, and such named rates can not be increased.

(c) This subsection enumerates the various factors which the President may consider *in so far as he finds it practicable*, in ascertaining such differences in costs of production. These are, briefly: (1) Differences in conditions in production; (2) differences in the wholesale selling prices; (3) advantages granted to a foreign producer by his Government, or others; and (4) any other advantages or disadvantages in competition. It provides that the United States Tariff Commission shall make public investigations to assist the President; that no proclamation shall be made by the President until

such an investigation has been made; that whenever he determines that the conditions which brought about such proclamation have changed or no longer exist, he shall modify or terminate it; that he may not transfer any article from the free list to the dutiable list or vice versa, or change any duty in form, and that whenever the act provides a maximum ad valorem duty, he may not exceed that maximum rate.

The three remaining subdivisions are immaterial in so far as this inquiry is concerned.

It is most vigorously contended that this legislative plan is an attempt by the Congress to delegate to the President its power to legislate and fix rates of duties on imports, a power which, under the Constitution, can be exercised only by it. It will be at once conceded by all that, if said section 315 is such an attempted delegation, it can not stand. No principle is more vital to our national perpetuity, more zealously guarded by our courts, or more earnestly adhered to by our people than the continuance of the integrity and independence of the three departments of our Government—the legislative, the executive, and the judicial.

What constitutes a delegation of legislative power has been a subject of frequent consideration by our courts.

The Supreme Court, in *In re Brig Aurora*, 7 Cr. 382, had before it the forfeiture of a British vessel which had been seized by virtue of the provisions of an act of Congress dated May 1, 1810, intended to preserve the neutral commerce of the United States from violation. The revival of certain of the provisions of this law depended upon the issuance of a proclamation by the President, after a finding of fact by him, and it was contended that this was a delegation of legislative power. The Supreme Court held to the contrary.

In *Miller* v. *Mayor of New York*, 109 U. S. 385, the court had under consideration the act of Congress of March 3, 1869, 15 Stat. 336, ch. 139, granting authority to erect a bridge over the East River and giving to the Secretary of War power to prescribe conditions upon which it should be built. This was held not to be a delegation of legislative power, and it was said:

The execution of a vast number of measures authorized by Congress, and carried out under the direction of heads of departments, would be defeated if such were not the case. The efficiency of an act as a declaration of legislative will must, of course, come from Congress, but the ascertainment of the contingency upon which the act shall take effect may be left to such agencies as it may designate.

Perhaps the leading case and the one most often cited as to what constitutes and what does not constitute a delegation of legislative power is *Field* v. *Clark*, 143 U. S. 649. In that case the constitu-

tionality of section 3 of the tariff act of October 1, 1890, was challenged. That section provided that whenever the " President shall be satisfied" that the government of any country producing and exporting sugars, etc., was imposing duties or other exactions upon the products of the United States which, in view of the free introduction of such sugars, etc., into the United States " he may deem to be reciprocally unequal and unreasonable," it should be his duty, by proclamation, to suspend the provisions permitting free entry of such sugars, etc., for such time as " he shall deem just." The act fixed rates of duties to be levied during the continuance of such proclaimed period. Mr. Justice Harlan, in the comprehensive and erudite opinion filed in the case, called attention to the many similar laws enacted continuously since the foundation of the Government which conferred upon the Chief Executive the power to find the facts upon which their going into effect severally depended. In conclusion, the learned jurist summed up in a quotation from *Locke's Appeal*, 72 Pa. St. 491, 498:

The legislature can not delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend which can not be known to the law-making power, and, must, therefore, be a subject of inquiry and determination outside of the halls of legislation.

*Buttfield* v. *Stranahan*, 192 U. S. 470, involved the constitutionality of a statute known as the tea inspection act, approved March 2, 1897, 29 Stat. 604. That statute prohibited the importation of tea inferior to standards to be fixed by the Secretary of the Treasury, upon the recommendation of a board of seven members to be appointed by him. This statute also provided that, if imported tea was not up to said standards, it should be exported within six months, or, in default thereof, be destroyed by the customs authorities. It was claimed there, as here, that this was a delegation of legislative authority. This claim, however, was not entertained by the court, and it was said:

We are of opinion that the statute, when properly construed, as said by the Circuit Court of Appeals, but expresses the purpose to exclude the lowest grades of tea, whether demonstrably of inferior purity, or unfit for consumption, or presumably so because of their inferior quality. This, in effect, was the fixing of a primary standard, and devolved upon the Secretary of the Treasury the mere executive duty to effectuate the legislative policy declared in the statute. * * * Congress legislated on the subject as far as was reasonably practicable, and from the necessities of the case was compelled to leave to executive officials the duty of bringing about the result pointed out by the statute.

The constitutionality of various similar provisions in other acts has been challenged on similar grounds and the validity of such provisions upheld in the following cases: A provision of the national bankruptcy act of July 1, 1898, recognizing the exemptions fixed by the law of the bankrupt's domicile, in *Hanover National Bank* v. *Moyses*, 186 U. S. 181; the act of October 19, 1888, authorizing the Secretary of the Treasury, in case he shall be satisfied an alien is landed contrary to law, to detain and deport him, in the *Japanese Immigrant* case, 189 U. S. 86; the disposition of public lands by a State, through congressional authority, in *Butte City Water Co.* v. *Baker*, 196 U. S. 119; regulations of the Interstate Commerce Commission and Railway Association, fixing standards for drawbars for railway cars, in *St. Louis & I. M. Ry.* v. *Taylor*, 210 U. S. 281; orders of the Interstate Commerce Commission establishing methods of accounting, in *I. C. C.* v. *Goodrich Transit Co.*, 224 U. S. 194; the administration of the short and long haul provisions of section 4 of the act to regulate commerce, as amended by the act of June 18, 1910, in *Intermountain Rate* case, 234 U. S. 476; the enforcement of a motion-picture censorship law, in *Mutual Film Corp.* v. *Ohio Industrial Com.*, 236 U. S. 230; a provision of the Federal reserve act of December 23, 1913, authorizing the Reserve Board to grant special permits to certain national banks to act as trustees, etc., in *First National Bank* v. *Union Trust Co.*, 244 U. S. 416.

In some cases powers granted to administrative or executive officials or bodies have been upheld as constitutional, even though the exercise of such powers has resulted in the imposition of fines or penalties upon a citizen.

Section 18 of the river and harbor act of March 3, 1899, provided that, whenever the Secretary of War had good reason to believe a bridge over a navigable stream was an unreasonable obstruction to navigation, he might, after hearing, order the same changed, and if there was a refusal, cause a prosecution to be had; and that, upon conviction, the offender should be fined as fixed by law. Under this act, in *Monongahela Bridge Co.* v. *United States*, 216 U. S. 177, the bridge company was fined, and contended in the Supreme Court that the act in question was a delegation of legislative power. The court did not agree with this contention and said, in effect, that the statute had declared a general rule or policy, and had merely left to the Secretary of War the task of enforcing its provisions. The court added:

\* \* \* a denial to Congress of authority, under the Constitution, to delegate to an executive department or officer the power to determine some fact or some state of things upon which the enforcement of its enactment may depend, would often render it impossible or impracticable to conduct the public business, and to successfully carry on the operations of the Government.

To the same effect is *Union Bridge Co.* v. *United States*, 204 U. S. 364, 386, 387.

*United States* v. *Grimaud*, 220 U. S. 506, involved a regulation promulgated by the Secretary of Agriculture by virtue of the authority of the forest reserve act of March 3, 1891, 26 Stat. 1103, and its amendments. This act as amended provided that the Secretary of Agriculture might make regulations for the protection of such reserves and that violators of such regulations should be subjected to certain penalties fixed by Revised Statutes, section 5388. Regulation 45, issued in pursuance to such authority, prohibited grazing in such reserves without a permit. Grimaud was indicted for a violation of such regulation, and the matter came up on a demurrer to this indictment, the defendant claiming an unconstitutional delegation of legislative authority. The court held, in an illuminating opinion, that there was no attempted delegation of legislative authority, saying, in part:

But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions "power to fill up the details."

*Hannibal Bridge Co.* v. *United States*, 221 U. S. 194, was a case involving a criminal information against the Hannibal Bridge Co. and others for failing to comply with the orders of the Secretary of War relative to a bridge across the Mississippi River. The defendant claimed an unconstitutional delegation of legislative authority to the Secretary of War. The court held to the contrary, saying:

All that the act did was to impose upon the Secretary the duty of attending to such details as were necessary in order to carry out the declared policy of the Government * * *.

The most recent announcement of the Supreme Court on this subject is found in *United States* v. *The Chemical Foundation* (*Inc.*), decided October 11, 1926, 272 U. S. 1. This case involved, *inter alia*, section 12 of the trading with the enemy act of October 6, 1917, 40 Stat. 460, as amended. This section gave to the Alien Property Custodian all the powers of a common-law trustee, with power, under the supervision and direction of the President, to do anything necessary in the administration of the alien property trusts in his keeping. This was claimed to be a delegation of legislative power. But it was said by the court:

The determination of the terms of sales of enemy properties in the light of facts and conditions from time to time arising in the progress of war was not the making of a law; it was the application of the general rule laid down by the act. When the plenary power of Congress and the general rule so established are regarded, it is manifest that a limitation upon the excepted class is not a delegation of legislative power.

The following authorities and cases announce the same general principles: Cooley on Taxation, vol. 1, p. 100; Gray's Limitations of Taxing Power, 539; Cooley's Cons. Lim., p. 164, 7th ed.; Willoughby on Constitution, sec. 775, p. 1318; *St. L. M. B. Co.* v. *United States*, 188 Fed. 195; *State* v. *Public Service Com. (Mo.)*, 194 S. W. 287 (296); *State* v. *Briggs*, 77 Pac. 750 (Oreg.); *People* v. *Fire Assn.*, 92 N. Y. 311; *State* v. *A. C. L. R. Co.*, 56 Fla. 616, 623–626; *United States* v. *Domingo*, 152 Fed. 566; *Dastervignes* v. *United States*, 122 Fed. 30; *C. W. & Z. Railroad Co.* v. *Commissioners of Clinton County*, 1 Ohio St. 87; *State* v. *C. M. & St. P. Ry. Co.*, 38 Minn. 298–299; *Wayman* v. *Southard*, 10 Wheat. 1–41.

From a consideration of the authorities cited, it must be concluded that the law is well settled, and is, perhaps, most happily expressed in *C. W. & Z. Railroad Co.* v. *Commissioners, supra:*

> The true distinction, therefore, is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring an authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first can not be done; to the latter no valid objection can be made.

And this must, by the very force of circumstances, be the conclusion inevitably to be arrived at by any judicial tribunal. To-day the functions and requirements of government are so diverse and multiplied that no legislative body can, by statutory enactment, provide for each specific governmental need which may arise. If, perchance, it has wisdom and foresight sufficient to provide general policies which may apply, it has accomplished much.

Viewing said section 315 in the light of these authorities and its legislative history, it at once becomes evident that the Congress has endeavored to express therein a general legislative policy. This policy is to levy upon imported products sufficient duties to equalize the differences in cost of production in the United States and the principal competing countries from which such imports come. Under ordinary circumstances, the duties are those specifically named in the act; but, whenever these are insufficient to accomplish this expressed purpose, they shall be, within certain precautionary minima and maxima, increased or decreased accordingly. There is no uncertainty here as to the congressional intent and policy; no discretion is attempted to be given to the President to determine what the policy shall be; the law imposes upon him no duties and confers upon him no powers except to execute the law, if it be capable of execution. When the President proclaims a change of rate thereunder, the new rate of duty does not come into being as a result of the proclamation, but the proclamation and the rate of duty result from the law.

But it is contended by the appellant, that, even if it be conceded that the Congress has, in section 315, announced a general policy and purpose, that purpose is impossible of accomplishment because of the uncertainty of the act itself; that, using the various factors set forth in subsection (c), the President will not be able to compute and ascertain· the differences in cost of production of an imported product in the United States and the principal competing country; and that, even if he uses such factors, the language describing them is so broad and general as to leave him such latitude as to the means of computation that he may levy duties on imported products according to his discretion, thus exercising a purely legislative power.

Section 315, in substance, requires the President, before proceeding to make a change in the dutiable rate of an article, to make two findings of fact. First, he must find that the rate of duty specifically fixed by the act is not sufficient to equalize the differences in cost of production in the United States and in the principal competing country. To do this, the President must, of course, ascertain three subsidiary facts: (a) What the principal competing country is; (b) what the cost of production is in the United States; and (c) what the cost of production is in the principal competing country. Second, he must find what amount of decrease or increase of rate is necessary to equalize such difference. When he has made these findings of fact, the mandatory duty is laid upon him by the statute to make proclamation accordingly; in this respect, the law gives him no discretion.

It will be at once conceded, on a reading of section 315 (c), that a very broad latitude is given to the President in making such findings of fact. The various factors named in the subsection are to be used by him "in so far as he finds it practicable." A consideration of this language, taken with clause 4, "any other advantages or disadvantages in competition," makes it manifest that the Congress intended to give to the President and to the Tariff Commission prosecuting the same inquiry, discretion as to the means to be employed in ascertaining the facts; the factors were not to be confined to those enumerated in the statute, but, in order that there might be no misunderstanding as to the factors which might be considered, it was provided that the various factors specifically named *might*, *inter alia*, be considered by the President, if practicable, in arriving at the result.

From a very early period in our Government similar fact-finding powers to those here directed to be exercised by the President have been exercised by various officials connected with the collection of import duties. The act of April 20, 1818, 3 Stat. 433, provided

for the appointment of appraisers at certain ports of the United States, whose duty it was to estimate, in certain cases, the foreign market value of imported goods subject by law to ad valorem duties. No legislative restrictions or directions were made as to methods to be employed by them in arriving at such values. They were required only to find the facts, in any way they thought best. This general authority of appraisers, further developed by section 4 of the act of May 28, 1830, 4 Stat. 410, has continued until the present time. Tariff Act of 1922, sec. 500. The tariff act of August 30, 1842, 5 Stat. 563, sec. 16, provided that imported goods subject to ad valorem duties should be appraised according to their wholesale market value in the principal markets of the countries from which exported. It will not be necessary for the purposes of this opinion to more than refer, in passing, to the development of the method of appraisement by the creation of local appraisers and a board of three general appraisers. Section 12–13, customs administrative act of June 10, 1890, 26 Stat. 136–137. We have, in *United States* v. *Spingarn*, 5 Ct. Cust. Appls. 2, traced the development of the methods of appraisement of imported merchandise. See also *United States* v. *McConnaughey & Co.*, 13 Ct. Cust. Appls. 112.

By means of this legislative machinery, for over one hundred years the foreign market values of vast quantities of imported goods have been fixed at our ports and the principal markets of foreign countries have been ascertained. Necessarily, many elements have entered into such calculations, elements which have differed according to the circumstances of the particular case and the judgment of the appraiser who functioned in the matter. There could be no uniformity of procedure or scientific accuracy in such appraisements. It will be noted also that such appraisements determined the amount of ad valorem duties to be collected, unless entered at a higher value. Yet, whenever such appraisements have been questioned in the courts they have been sustained and the findings of fact made by the appraising officer or officers have been held to be conclusive, except when errors of law have intervened. *Stairs* v. *Peaslee*, 18 How. 521 (527); *Hilton* v. *Merritt*, 110 U. S. 97 (106–107); *Auffmordt* v. *Hedden*, 137 U. S. 310 (324); *Passavant* v. *United States*, 148 U. S. 214 (220–221); *Muser* v. *Magone*, 155 U. S. 240 (247); *Beer* v. *United States*, 1 Ct. Cust. Appls. 484; *Austin, Baldwin & Co.* v. *United States*, 7 Ct. Cust. Appls. 186; *Stirn* v. *United States*, 10 Ct. Cust. Appls. 17; *Goodyear Tire & Rubber Co.* v. *United States*, 11 Ct. Cust. Appls. 351. The decisions cited are based in part upon the principle of inviolability attached to the finding of fact by an administrative official when he proceeds within the law, and in part upon statutory enactments making such appraisements final and conclusive. Sec. 14, customs ad-

ministrative act of June 10, 1890, 26 Stat. 137; sec. 13, tariff act of August 5, 1909, 36 Stat. 99; par. M, Sec. III, tariff act of October 3, 1913, 38 Stat. 186. While we do not find that the constitutionality of the various statutes providing for such appraisements or making the same conclusive has been directly attacked in the cases cited, as a delegation of legislative power, the facts that for a century the legislative policy has been indicated by these various acts, and that they have been universally treated by the courts as valid must be given great weight in coming to a conclusion as to their validity.

The act of March 3, 1873, 17 Stat. 602, instructed the Director of the Mint to estimate annually the values of standard coins of foreign countries and the Secretary of the Treasury to proclaim such values annually. A similar method of ascertainment of such values still obtains. Sec. 522, Tariff Act of 1922. Such ascertainment necessarily leaves to the official making it a wide latitude as to methods. It follows that the amount of duty may be affected by the methods used and results obtained by this official. Such statutes have, however, universally received the approval of the courts. *Cramer* v. *Arthur*, 102 U. S. 612; *Hadden* v. *Merritt*, 115 U. S. 25 (27); *United States* v. *Klingenberg*, 153 U. S. 93; 100.

Section 5 of the tariff act of July 24, 1897, provided for a countervailing duty to be levied upon the products of any country which bestowed any grant or bounty upon goods exported; the net amount of these bounties or grants was to be ascertained and proclaimed from time to time by the Secretary of the Treasury. No method was prescribed by which these determinations should be made. A similar provision still obtains in the law of customs. Sec. 303, Tariff Act of 1922. The exercise of these functions by the Secretary of the Treasury has been judicially approved, although the extreme difficulty of making such ascertainment has not been overlooked by the courts. *Downs* v. *United States*, T. D. 22984, 4 Treas. Dec. 405, aff. in 113 Fed. 144, aff. in 187 U. S. 496; *Nicholas & Co.* v. *United States*, 7 Ct. Cust. Appls. 97, aff. in 249 U. S. 34.

Section 11 of the tariff act of July 24, 1897, 30 Stat. 212, contained a provision that when the actual market value of an imported article could not be ascertained " to the satisfaction of the appraising officer," he should estimate the cost of production thereof and return the same as the dutiable valuation. This provision of law was continued in section 11, tariff act of August 5, 1909, 36 Stat. 97; in paragraph L, Section III, tariff act of October 3, 1913, 38 Stat. 185; and in section 402 (c), Tariff Act of 1922, 42 Stat. 949. It will thus be seen that this provision of law, which, it must be assumed, was functioning in a satisfactory manner, has received legislative approval for many years. This court has on several occasions, while not

called upon to decide the constitutional question here involved, interpreted and sustained it. *Austin, Baldwin & Co.* v. *United States,* 7 Ct. Cust. Appls. 186; *Stirn* v. *United States,* 10 Ct. Cust. Appls. 17; *Goodyear Tire & Rubber Co.* v. *United States,* 11 Ct. Cust. Appls. 351.

Paragraph 28 of the Tariff Act of 1922 fixes certain ad valorem duties upon enumerated coal-tar products, providing that the duties shall be computed upon the American selling price of the same. The American selling price, as defined in section 402 (f) of the same act, is the price, including cost of containers and other costs, etc., incident to placing the merchandise in condition packed ready for delivery, at which the said article is "freely offered for sale to all purchasers in the principal market of the United States, in the ordinary course of trade and in the usual wholesale quantities in such market," or the price which the owner, etc., would have received or was willing to receive for such merchandise when sold in the ordinary course of trade and in the usual wholesale quantities, at the time of exportation. It will be observed that an extremely wide range of discretion is given by this statute to the appraising officer as to methods of ascertainment of the American selling price. Upon the result of the methods used by him, the amount of duty paid will be increased or decreased. In *Kuttroff, Pickhardt & Co.* v. *United States,* 12 Ct. Cust. Appls. 299, the constitutionality of this statute was challenged, it being claimed that, as a matter of fact, the Congress had by said paragraph 28 delegated to the American producers the power to fix the rates of duty upon competitive imported products. We held the paragraph to be an exercise of constitutional power by the Congress.

We have already, in another connection, called attention to *Field* v. *Clark,* 143 U. S. 649, and *Buttfield* v. *Stranahan,* 192 U. S. 470. It is only necessary at this time to point out that, in both cases, particularly the former, the very broad latitude given to the executive equaled, if it did not much exceed, that claimed to be given by the statute before us. It would be quite difficult to conceive of a greater range of authority than that found in *Field* v. *Clark,* where the Chief Executive was empowered to take certain imports from the free list and place them upon a dutiable list, when "he was satisfied" that duties were being imposed by some country upon our exports, which "he may deem to be reciprocally unequal and unreasonable." In other words, under the statute in the *Field* case the President was empowered to make goods dutiable by removing them from the free list. No attempt was there made as in the statute before us now, to name any elements which the President might make use of in arriving at a finding of fact. It is contended

that the *Field* case, *supra*, differs from the one at bar here, in that in the *Field* case, specific rates of duty were named in the act to take effect upon the issuance of the President's proclamation, and here the rate is to be fixed by the President. We are unable to perceive the difference. In each case, the effort of Congress was to protect products of the United States which might be threatened by injurious competitive products from abroad—in one case by unfair governmental methods, in the other by differing business conditions. The important thing in each case was that an amount of duty be imposed, sufficient for the protection of the threatened industry. It cannot be concluded that naming the rate in the *Field* case and directing the Executive to compute it in the case at bar make that law constitutional and this one unconstitutional. The Constitution, in conferring upon the Congress the power to " lay and collect * * * duties," does not declare, even by implication, that the Congress must exercise the power thus given to it by naming in specific terms the rate of duty to be applied. When it appears that the power to lay duties has been given to the Congress without reservation, we may safely conclude that the way in which that power shall be exercised is left to its discretion. As was well said by the great Chief Justice in *McCulloch* v. *Maryland*, 4 Wheat. 315:

But we th'nk the sound construction of the Constitution must allow to the National Legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people.

See also *Osborn* v. *United States Bank*, 9 Wheat. 737, and *Murray's Lessee et al.* v. *Hoboken, etc.*, 18 How. 272; 281.

Whether the particular statute before us is wise or unwise is not for our consideration. This is a political question, with which courts will not deal. The cure for an unwise and injudicious exercise of its constitutional powers by the Congress lies with the people, from whom its members derive their commissions. *Springer* v. *United States*, 102 U. S. 586; *Kuttroff, Pickhardt & Co.* v. *United States*, 12 Ct. Cust. Appls. 299 (304) ; *McCray* v. *United States*, 195 U. S. 27 (54) ; *Flint* v. *Stone, Tracy Co.*, 220 U. S. 107; 169.

The statements of many persons are cited, some of whom are present or past members of the United States Tariff Commission, to the effect that it is impossible to precisely establish the cost of production of an article. This may be conceded. It is likewise impossible to ascertain, aside from the realm of mathematics, with scientific accuracy, most of the things upon which our lives and human governments depend. At most, we must be content with a reasonable accuracy, and this, we believe, is all that is required in the administration of the law now before us. As was said in *Cramer* v.

Arthur, 102 U. S. 612; 617, a case involving the conversion of currency:

The Government gets at the truth, as near as it can, and proclaims it.

And in *Patton* v. *Brady, executrix*, 184 U. S. 608; 622, in commenting upon the uniformity clause in section 8, Article I of the Constitution:

Perfect uniformity and perfect equality of taxation, in all the aspects in which the human mind can view it, is a baseless dream, as this court has said more than once.

We are, therefore, of the opinion that section 315 is not so uncertain of administration as to amount to a delegation of legislative power to the Chief Executive, but is, in that respect, a valid exercise of the constitutional power of the Congress.

It is next contended by appellant that the President can not be haled into court and sued by a citizen; that his acts under section 315 are not reviewable by the courts; that the acts of an administrative officer exercising delegated power must, if they are to be held valid, always be so subject to review; and that the President may, under this section, practically rewrite a tariff law in form and in substance, without accountability to anyone. If this be true, it goes without saying that the section can not be sustained. But we can not agree with either the premises or the conclusion. The office of President is one of high standing and vast responsibility; public policy requires, and the courts have uniformly held, that, in the discharge of his high office, in all those matters which have been entrusted to his discretion, he is not to be interfered with or under the control of the courts. Such powers are political in their nature and for the proper exercise of these the President is responsible only to the country. The power of the President to appoint diplomatic representatives, members of the judiciary, and subordinate officials, to negotiate treaties, to control and direct the activities of the Army and Navy, to supervise foreign relations, and to recommend and veto acts of the legislative branch of the Government, are patent examples of such powers. In the execution of such powers, the President may act unwisely and to the great injury of individual and national interests, but for such acts there can be no remedy, under our Constitution, but the political one committed to the suffrage of the people. But when duties are imposed upon the President over and beyond his purely political ones, duties which he does not perform because of his constitutional power as Chief Executive but because the Congress has constituted him an agent for the better execution of some legislative policy, and in the execution of which powers personal or property rights are involved, then such acts are ministerial only, and are subject to review by the courts. Or, as was better said by Chief

Justice Marshall in *Marbury* v. *Madison*, 1 Cr. 137, 166, speaking of the Secretary of State:

But when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot, at his discretion, sport away the vested rights of others.

This conclusion finds further support in the following authorities: *State of Mississippi* v. *Johnson*, 4 Wall. 475, 500; *Morrill* v. *Jones*, 106 U. S. 466; *Webster* v. *Luther*, 163 U. S. 331, 342; United States v. *Wong Kim Ark*, 169 U. S. 649, 694; *American School of Mag. Healing* v. *McAnnulty*, 187 U. S. 94, 110; *Burfenning* v. *C. St. P., etc., Ry.*, 163 U. S. 321, 323; *Monongahela Bridge* v. *United States*, 216 U. S. 177, 195.

It is probable that the Congress conferred upon the President this grant of power with the idea that, because of the great publicity attending the acts of the Chief Executive and his great responsibility to the people, there would be less likelihood of precipitate and ill-advised action, and greater dignity and standing would attend the accomplished act. But whatever the legislative purpose may have been, the acts of the President thereunder are entitled to no greater significance and should be measured by no other rule than that to be given and used in considering the acts of any other fact-finding official or board which the Congress may have named.

The law is not concerned as to the identity or official standing of the person who shall perform the duties required, but regards only the powers which are granted and the things which may be done as a result of such grant. An analysis of section 315 discloses that the President is not therein given any discretion as to what he shall do, but only as to how he shall do it. We have hereinbefore set out at some length the powers granted by the section, and it is not necessary to recount them again. It will suffice to say that the powers granted to the President by the section are circumscribed within narrow bounds. Under subsection (*a*) he may increase or decrease the rate or change a classification, but only to the extent necessary to accomplish the purpose of the Congress, and then not more or less than 50 per centum of the rates specified in the act. He may not change the classification of a dutiable article from the free list to the dutiable list or vice versa, or from a specific to an ad valorem rate, or vice versa. Under subsection (*b*) he can not decrease an ad valorem rate more than 50 per centum of the rate specified in the statute, and he cannot increase such rate. He can take no action under this section without a prior investigation by the United States Tariff Commission. He must proclaim a change back to the rate specified in the statute when the emergency is at an end. If,

in case of any duty provision specified in the statute, the President has not proclaimed a change of rate or classification as provided in section 315, it must be presumed, as a matter of law, and agreeably to the familiar doctrine that every public official must be assumed, in the absence of proof to the contrary, to have performed his duties in pursuance to law, that, as to such rate, the President has not found that such changes are necessary to equalize the differences in cost of production in the United States and the principal competing country. The first announcement of a finding requiring such a change in duty is the proclamation to be issued by the President. Until such proclamation has been issued, the President may not, under this statute, be coerced or controlled by the mandates of the courts.

But when, in the performance of his duties, under this section, the President proclaims a change of duty, if, in so doing, he acts beyond the law or fails to comply with its express mandates, then we can not doubt that the person aggrieved thereby may find adequate relief in the courts. We need not go beyond the case at bar for an illustration of this. Here the importer has protested against the imposition of additional duties because of the alleged unconstitutionality of the act under which it was imposed, and upon that claim he is entitled to a proper hearing in the courts. Can it be denied that if, in the imposition of this rate of duty, the President had proceeded without taking the steps directed by section 315, the importer could have set these facts out in his protest and had an adjudication thereon? To deny this would be to give to the act of the President a peculiar sanctity and inviolability not attaching to the acts of other officials of the Government performing similar fact-finding duties; and this we are neither called upon to do nor justified by the law in doing. We are unable to see why any different rule of law should be applied to the President's finding of facts under section 315 than the one applied to the finding of valuation by an appraiser of merchandise at our ports. In such cases, while the courts have held the finding of valuation made by the appraiser to be conclusive, if he proceeds upon a wrong principle, contrary to law, his acts are subject to judicial control and correction. *Badger* v. *Cusimano,* 130 U. S. 39; *Robertson* v. *Frank Bros. Co.,* 132 U. S. 17 (24); *Muser* v. *Magone,* 155 U. S. 240 (247); *United States* v. *Passavant,* 169 U. S. 16 (21).

We are, therefore, unable to agree with this contention made by appellant.

Finally, it is argued that section 315 discloses that its primary and only purpose is the protection of the industries of the United States and not the raising of revenue for governmental purposes; that the section, in effect, proposes to take from the pockets of the taxpayers.

moneys with which to protect a favored class, and that the Congress has no constitutional power to so legislate.

The Tariff Act of 1922 is entitled "An Act to provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes." 42 Stat. 941, 942. In each of the subsections (a) and (b) of section 315 the preamble is "That in order to regulate the foreign commerce of the United States and to put into force and effect the policy of the Congress by this Act intended," and in each the preamble is followed by a recital that this policy is to levy duties, within certain prescribed limits, sufficient to equalize the differences in costs of production in the United States and the principal competing foreign countries. This appears plainly to be an effort to afford protection to certain industries of the United States. But must this protection be considered as the sole and only reason for the legislation, or as a purpose incidental to its revenue provisions? We believe the latter view should obtain. The Constitution gives to the legislative branch of our Government the right to levy taxes and duties. Aside from the constitutional inhibition against taxes on exports and the requirement of uniformity in indirect taxes and proportion in direct taxes, the power to impose such taxes and duties was given without reservations. How or when they may be imposed are political questions. *Lane County* v. *Oregon*, 7 Wall. 71 (77–79); *Loan Assn.* v. *Topeka*, 20 Wall. 655 (663). It therefore frequently occurs that taxes or duties are imposed which have a double purpose of revenue and other purpose thought to be for the public welfare. In such cases the courts have usually held the revenue purpose to be controlling and the public-welfare purpose to be incidental only. A case in point is *In re Kollock*, 165 U. S. 526. There Kollock was indicted and convicted for a violation of the oleomargarine act of August 2, 1886, 24 Stat. 209, ch. 840. That act fixed certain taxes to be paid by manufacturers and dealers in oleomargarine, and provided generally for the conduct of such business. Appellant contended the act was a penal statute, that it delegated the power to the commissioner to define the crime, and was hence invalid. The Supreme Court said:

The act before us is on its face an act for levying taxes, and although it may operate in so doing to prevent deception in the sale of oleomargarine as and for butter, its primary object must be assumed to be the raising of revenue.

In *United States* v. *Doremus*, 249 U. S. 86, the constitutionality of the narcotic drug act of December 17, 1914, 38 Stat. 785, was assailed. The court, in sustaining the constitutionality of this act under Article I, section 8, of the Constitution, said:

And from an early day the court has held that the fact that other motives may impel the exercise of Federal taxing power does not authorize the courts to inquire into that subject. If the legislation enacted has some reasonable

relation to the exercise of the taxing authority conferred by the Constitution, it can not be invalidated because of the supposed motives which induced it.

In the *Child Labor Tax* case, 259 U. S. 20, the court, while holding the particular statute before it to be invalid, recognized and reiterated the doctrine announced in the above cases, in these words:

Taxes are occasionally imposed in the discretion of the legislature on proper subjects with the primary motive of obtaining revenue from them and with the incidental motive of discouraging them by making their continuance onerous. They do not lose their character as taxes because of the incidental motive.

The statute before us here does not appear to be subject to the objections which influenced the judgment of the court in the *Child Labor* case, *supra*. Section 315 is a part of a comprehensive and complete revenue measure, and, although the purpose of protection to domestic industries is plainly evident therein, this purpose must, we believe, in harmony with the authorities cited, be held to be one incidental to the primary purpose of revenue.

If, however, section 315 may be considered merely as a measure for the protection of domestic industries, and not as a revenue measure, it is argued by the Government that, as such, it is a valid exercise of the power granted to Congress in Article I, section 8:

The Congress shall have power * * * to regulate commerce with foreign nations, and among the several States, and with the Indian tribes.

As has already been noted, both the title of the Tariff Act of 1922 and the text of section 315 recite that one of the purposes of said act and section is to regulate the foreign commerce of the United States. The congressional intent is therefore plainly evident. But is the levying of discriminatory duties upon certain classes of imports in order to protect and encourage certain domestic industries a proper exercise of the constitutional grant of power to regulate commerce? This raises a question of much nicety but one which, we think, may be answered by reference to a line of legislative enactments and judicial pronouncements extending back into the earliest periods of the existence of our Government.

Section 1 of the tariff act of July 4, 1789, 1 Stat. 24, the first tariff act enacted by the Congress of the United States, contained this preamble:

Whereas it is necessary for the support of government, for the discharge of the debts of the United States, and the encouragement and protection of manufacturers, that duties be laid on goods, wares and merchandises imported:

Following this act, a legislative policy of protection for the shipping and industries of the United States began, a policy which has continued through every general tariff revision act, and in many customs administration and other acts, from that time to the present. Many of these acts, for convenience in reference, are enumerated in

the margin.[1]  For 138 years this legislative practice has persisted unchallenged and apparently with the approval of the people. While we do not wish to be understood as holding that such a legislative practice is in itself conclusive as to the constitutionality of a measure framed along such lines, or that continued legislative practice can make constitutional that which is clearly unconstitutional, yet a legislative practice of such long continuance (some of which is contemporaneous with the Constitution) and so well understood and tacitly agreed to, must be given great weight in determining the validity of a legislative enactment the constitutionality of which is thought to be doubtful; and such has been the uniform holding of our courts. *Stuart* v. *Laird*, 1 Cr. 299 (309) ; *Waring* v. *Clarke*, 5 How. 440 (458) ; *Cooley* v. *Philadelphia*, 12 How. 299 (315) ; *Veazie Bank* v. *Fenno*, 8 Wall. 533 (544) ; *Ames* v. *Kansas*, 111 U. S. 449 (469) ; *Field* v. *Clark, supra*, 683 ; *McPherson* v. *Blacker*, 146 U. S. 1 (27) ; *Fairbank* v. *United States*, 181 U. S. 283 (307) ; *McGrain* v. *Daugherty*, 273 U. S. 135, decided January 17, 1927.

The scope and extent of the congressional power to regulate commerce has received the frequent consideration of the Supreme Court of the United States.  A brief reference will be made to some of the cases.

*Gibbons* v. *Ogden*, 9 Wheat. 1, the leading case on the subject, concerned an alleged exclusive franchise for navigating certain waters of the State of New York.  In that case it was pointed out (pp. 200–202) that the act of laying duties on imports must be considered primarily as a branch of the taxing power as given by section 8, Article I, of the Constitution.  But it was also observed:

> It is true, that duties may often be, and in fact often are, imposed on tonnage, with a view to the regulation of commerce; but they may be also imposed, with a view to revenue;

*Russell* v. *Williams*, 106 U. S. 623, dealt with certain imports from China, subjected to an additional 10 per centum ad valorem duty under section 6 of the tariff act of March 3, 1865, which provided such an additional duty upon any merchandise imported from any place east of the Cape of Good Hope.  The court held that this pro-

---

[1] Sec. 5, act of July 4, 1789 (1 Stat. 24) ; secs. 2, 3, and 4, act of Aug. 10, 1790 (1 Stat. 180) ; sec. 51, act of Mar. 3, 1791 (1 Stat. 210) ; sec. 3, tariff act of Mar. 27, 1804 (2 Stat. 299) ; sec. 4, tariff act of Apr. 27, 1816 (3 Stat. 313) ; sec. 1, tariff act of May 6, 1822 (3 Stat. 681) ; sec. 4, act of Jan. 7, 1824 (4 Stat. 3) ; sec. 3, act of Apr. 20, 1826 (4 Stat. 154) ; act of May 9, 1828 (4 Stat. 269) ; sec. 1, act of May 24, 1828 (4 Stat. 308) ; act of May 29, 1830 (4 Stat. 419) ; sec. 1, act of May 29, 1830 (4 Stat. 419) ; sec. 3, act July 13, 1832 (4 Stat. 579) ; sec. 1, act of July 14, 1832 (4 Stat. 604) ; act of Mar. 3, 1845 (5 Stat. 748) ; secs. 1 and 4, act of Mar. 1, 1873 (17 Stat. 482) ; sec. 3, and par. 231, sec. 17, act of Oct. 1, 1890 (26 Stat. 567) ; secs. 21 and 22, tariff act of Aug. 27, 1894 (28 Stat. 551) ; title and sec. 4, tariff act of July 24, 1897 (30 Stat. 151) ; title and secs. 2, 4, and 6, tariff act of Aug. 5, 1909 (36 Stat. 11) ; Sec. IV, A and B, tariff act of Oct. 3, 1913 (38 Stat. 102).

vision of the law was intended to be, and was, a regulation of commerce under the constitutional provision cited.

In *Buttfield* v. *Stranahan, supra*, the court, in discussing the tea inspection act of March 2, 1897, 29 Stat. 604, said:

The power to regulate commerce with foreign nations is expressly conferred upon Congress, and being an enumerated power is complete in itself, acknowledging no limitations other than those prescribed in the Constitution. * * * it is not to be doubted that from the beginning Congress has exercised a plenary power in respect to the exclusion of merchandise brought from foreign countries; not alone directly by the enactment of embargo statutes, but indirectly as a necessary result of provisions contained in tariff legislation.

On numerous occasions acts of Congress declaring embargoes, either directly or by proclamation of the President, have been sustained as a valid exercise of its constitutional power to regulate commerce. *The Brig Aurora, supra; State of Pennsylvania* v. *Wheeling and B. Bridge Co.*, 18 How. 421. In the case last cited it was said (439):

During the existence of the embargo, in the year 1808, it was contended that, under the commercial power, an embargo could not be imposed, as it destroyed commerce. But it was held otherwise; so that the constitutionality of a regulation of commerce by Congress does not depend upon the policy and justice of such an act, but generally upon its discretion.

In *Leisy* v. *Hardin*, 135 U. S. 100, Mr. Chief Justice Fuller said for the court (116):

And Congress, under its general power to regulate commerce with foreign nations, may prescribe what article of merchandise shall be admitted and what excluded.

To the same effect are *Field* v. *Clark, supra*, and *The Abby Dodge*, 223 U. S. 166, 176.

In the celebrated case of *Brown* v. *Maryland*, 12 Wheat. 419, the court, after observing that commerce is intercourse, stated:

It is inconceivable, that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. * * * Congress has a right, not only to authorize importation, but to authorize the importer to sell.

The act of February 13, 1862, 12 Stat. 338, prohibited the sale of spirituous liquors to certain Indians. The Supreme Court, in *United States* v. *Holliday*, 3 Wall. 407, 417, held the act valid as a regulation of commerce. In Case of the *State Freight Tax*, 15 Wall. 232, the court quotes with approval the definition given by Judge Story of the word " commerce," as used in the Constitution:

Commerce consists in selling the superfluity, in purchasing articles of necessity, as well productions as manufactures, in buying from one nation and selling to another, or in transporting the merchandise from the seller to the buyer to gain the freight.

In *Henderson* v. *Mayor of New York*, 92 U. S. 259, and in *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 334, the regulation of foreign immigration was held to be within the congressional power to regulate commerce. The power to build or encourage interstate railways and highways was sustained as a proper exercise of that power in *California* v. *Pac. R. R. Co.*, 127 U. S. 1, 39.

Reference is also had to the *Lottery Case*, 188 U. S. 321, 359, sustaining the antilottery act of March 2, 1895, 28 Stat. 963, and *Hoke and Economides* v. *United States*, 227 U. S. 308, 323, sustaining the validity of the Mann Act of June 25, 1910, 36 Stat. 825.

In *Hammer* v. *Dagenhart*, 247 U. S. 251, the constitutionality of the child labor act of September 1, 1916, 39 Stat. 675, was involved. The statute was held not to be a regulation of interstate commerce. The court there observed that there were special reasons, based upon public policy, which led to the conclusion in *Hoke* v. *United States*, *supra*, and other similar cases, which do not obtain in ordinary commercial intercourse. It was, however, reiterated that Congress had ample power to regulate commerce, except wherein it might attempt to assume a jurisdiction of the States, reserved and not granted by the Constitution.

The rule, we believe, to be gathered from the cases cited, when read in the light of the later announcement in *Hammer* v. *Dagenhart*, supra, and with due consideration for the perpetuation of our dual system of national and state governments, may be stated thus:

In foreign commerce, the power to regulate includes the right to levy discriminatory duties and the right to prohibit; and this legislative right is absolute.

In interstate commerce the right to regulate includes the right to prohibit when the character of the traffic prohibited is such as to require prohibition for the public welfare. In such cases the test is always the character of the act prohibited. Where there is no reasonable ground for the prohibition, resulting from a public necessity, such prohibition of commerce will not be upheld.

In *Houston, East & West Texas Ry.* v. *United States*, 234 U. S. 342, 351, the court, in discussing the constitutional power of Congress to regulate commerce, said:

Congress is empowered to regulate,—that is, to provide the law for the government of interstate commerce; to enact "all appropriate legislation" for its "protection and advancement," *The Daniel Ball*, 10 Wall. 557, 564; to adopt measures "to promote its growth and insure its safety," *County of Mobile* v. *Kimball*, *supra*; "to foster, protect, control, and restrain."

Again, in *Dayton-Goose Creek Railway* v. *United States*, 263 U. S. 456, 478, it was said:

This is too narrow a view of the commerce clause. To regulate in the sense intended is to foster, protect and control the commerce with appropriate regard

to the welfare of those who are immediately concerned, as well as the public at large, and to promote its growth and insure its safety.

While the last two cases cited dealt with questions of interstate commerce, no reason is apparent why the same conclusions should not be reached in matters pertaining to foreign commerce, the constitutional grant of power as to each being incorporated in the same language.

From a consideration of these authorities, together with the evident purpose of the Congress as expressed in the act before us, section 315, imposing sufficient duties upon imported products to equalize the difference in cost of production in the United States and the principal competing country, is a valid exercise of the constitutional grant of power to the Congress to regulate commerce. It was for the Congress to select the means by which it thought the best interests of the country would be served in encouraging, fostering, and protecting the commerce and industries of the country. Having done so within constitutional limits, the courts will not interfere. If it be said that legislation which thus protects one industry at the expense of others should be declared invalid therefor, then we must deny to the Congress the power to lay any duties at all. The power to lay duties implies the power to select the objects upon which such duties are laid. Necessarily, the laying of a duty upon one product and not upon another may give added advantage or disadvantage to the domestic producer of the product thus made dutiable. But what might be said of the inequality of the laying of duties may also be said of all taxes laid for public purposes. The needs occasioned by drought, famine, pestilence, and flood, the pauper, the dependent, and the criminal, are burdens unequally borne; and yet, while the means of one citizen are taken from him to minister to another, it is still deemed to be a public purpose, the benefits of which all citizens equally enjoy. The right of our National Legislature to take such steps as the people, acting through it, may think best suited to protect, foster, and encourage its commerce and industrial life can not be denied; for to so deny it would be to deny the sovereign right which every properly constituted government has to perpetuate itself and to accomplish one of the chief purposes for which it was created.

It is apparent, from the facts hereinbefore recited and the discussion had, that the single question presented for determination is, whether Congress, in attempting to grant to the President the power to increase the rates of duty specified in the statute by adding thereto the differences in cost of production ascertained by him under section 315 (a), acted within constitutional limits, or whether such act

was, in that respect, null and void; and our decision is limited to that precise question.

We find no error in the record and the judgment of the court below is *affirmed*.