WILLIAM A. FOSTER & CO., INC. *v.* UNITED STATES (No. 3889)[1]

---

[1] T. D. 47992.

132

United States Court of Customs and Patent Appeals, November 4, 1935

*John R. Rafter* for appellant.

*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States.

[Oral argument October 7, 1935, by Mr. Rafter and Mr. Jackson]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

The appellant, William A. Foster & Co., Inc., made three importations of cast polished plate glass, unsilvered, at the port of New York, under the Tariff Act of 1922. These were classified by the collector under the provisions of paragraph 222 of said act, as modified by the Presidential proclamation, T. D. 43157. The duty assessed by virtue of said proclamation was at the rate of 16 cents per square foot on sizes not exceeding 384 square inches; on sizes above 384 square inches, and not exceeding 720 square inches, duty was assessed at 19 cents per square foot; on sizes above 720 square inches, duty was assessed at 22 cents per square foot.

Said paragraph 222 is as follows:

PAR. 222. Cast polished plate glass, finished or unfinished, and unsilvered, not exceeding three hundred and eighty-four square inches, 12½ cents per square foot; above that, and not exceeding seven hundred and twenty square inches, 15 cents per square foot; all above that, 17½ cents per square foot. Plate glass described in this paragraph containing a wire netting within itself, not exceeding three hundred and eighty-four square inches, 15 cents per square foot; above that, and not exceeding seven hundred and twenty square inches, 17½ cents per square foot; all above that, 20 cents per square foot.

The importer protested in each entry, alleging that the imported goods were dutiable only at the rates fixed by said paragraph 222, alleging that the proclamation of the President,

is erroneous, illegal and void, because the President, in determining and proclaiming the increased rates of duty therein specified, did not comply with the law, proceeded on a wrong principle and contrary to law, and exceeded the authority conferred on him by law.

When the cause came on to be tried, the parties presented and offered in evidence a stipulation which, in principal part, is as follows:

It is hereby stipulated and agreed:

1. That the merchandise covered by the protest in the above entitled case is cast polished plate glass, unsilvered, some of which does not exceed 384 square inches, some of which is above that and does not exceed 720 square inches and some of which is above that; and that none of said glass contains wire netting within itself.

2. That such merchandise was imported into the United States in July, August, and September, 1929, and was assessed with duty, according to its size, at the increased rates specified in the presidential proclamation dated January 17, 1929, and published in T. D. 43157, namely, at 16 cents per square foot for the glass not exceeding 384 square inches, at 19 cents per square foot for the glass above that and not exceeding 720 square inches, and at 22 cents per square foot for the glass above that.

3. That pages 1 to 57 inclusive and charts 1 to 5 inclusive of Exhibit A, attached hereto, are a true copy of the United States Tariff Commission's report to the President of the investigation on cast polished plate glass which it made prior to the issuance of said presidential proclamation.

Dated New York, N. Y., May 29, 1934.

This stipulation was received, and no further evidence being offered by either party, the court, one member dissenting, entered judgment overruling the protest. From this judgment the importer has appealed.

The Customs Court was of opinion that the matter was *stare decisis,* citing *William A. Foster & Co. (Inc.) et al.* v. *United States,* T. D. 44849, 59 Treas. Dec. 1018, affirmed by this court in 20 C. C. P. A. (Customs) 15, T. D. 45673.

Counsel for appellant states in his brief the issue in this court as follows:

Only one substantive question is raised by this appeal, namely, Did the Tariff Commission, prior to the issuance of the presidential proclamation in question, make an investigation which satisfied the requirements of section 315 of the Tariff Act of 1922?

The United States Tariff Commission will be hereinafter alluded to as "the commission."

The argument of counsel for appellant maintains that the report of the commission, in this matter, is material, and discloses that the commission did not make an investigation of the costs of production of the articles named in said paragraph 222, namely, glass of the sizes specified therein, but made a general investigation only of cast polished plate glass, finished or unfinished, and unsilvered, and that this is not such an investigation as the statute, section 315, requires.

In the course of the argument, two other collateral questions are raised: First, that the report is material, although the lower court is alleged to have held that it was immaterial; second, that the report of the commission must find and report differences in cost of production in order that the President may act. In other words, that it is not sufficient for the commission to investigate and report that it is unable to find such costs, but must find them, or otherwise the President will have no jurisdiction to proceed.

The report of the commission, attached to the stipulation and marked Exhibit A, is an extremely comprehensive report on the production costs of plate glass of the kind mentioned in said paragraph 222.

The investigation was occasioned by applications filed with the commission on October 6, 1922, and on November 14, 1922, by certain domestic companies, in which the applicants asked for "a decrease in the rates of duty on mirror plates." The investigation was instituted on March 27, 1923, with respect to mirror plates (polished plate glass suitable for mirrors) and on May 5, 1923, was extended to include all cast polished plate glass. For the years 1923 and 1924 field work was carried on in the United States and in Belgium, found to be the principal competing country. A public hearing was had in Washington at the office of the commission in November and December 1925, of which hearing all parties interested were given reasonable notice to be present, produce evidence, and be heard. Representatives of the Belgium plate glass manufacturers were given notice of these hearings, at which time representatives of Belgian plate glass manufacturers and importers of plate glass asked that the investigation be continued, and that they be given an opportunity of getting up-to-date information for the use of the commission. At this time, the Belgian manufacturers assured the commission that it would be given an opportunity to get complete cost information from their records.

Investigation was continued throughout the summer of 1926, and a second public hearing had in May 1927. At this second public hearing, briefs were filed by interested parties. Finally, on August 22, 1928, the report of the commission was transmitted to the President. Thereafter, on January 17, 1929, the proclamation of the President was issued, in and by which the President found that the increases of duty herein mentioned as assessed against the importations in question were necessary to equalize the difference between the costs of production of domestic plate glass as described in said paragraph 222 and the cost of similar articles wholly or in part the growth or product of competing foreign countries.

We have examined with care the report of the commission and its findings which are a part of the same. It consists of fifty-nine printed pages and many tabulated statements. Throughout, it

shows great care in preparation and the result of much investigation, both in the glass industry in the United States and of foreign countries, chiefly Belgium. The cost of production by various processes, both in the United States and abroad, is given as it was ascertained from an inspection of books and plants, domestic and foreign, which costs are closely analyzed and detailed in said report. From this report it appears that the costs of production were ascertained insofar as the commission was able to find them. So far as the court can observe, every element of cost of production of such plate glass which the commission was able to ascertain is shown in detailed form. Processes are described, and the cost of producing glass by these processes is given.

One part of the summary attached to said report is particularly worthy of consideration, in view of the inquiry here. It is as follows:

5. *Application of cost difference to three rates of duty.*—The tariff act imposes three rates of duty upon cast polished plate glass graduated according to size. The books of the manufacturers, both domestic and foreign, were kept in such a form that it was impossible to ascertain costs of production for the respective sizes included within the different duty brackets. The costs obtained, therefore, were weighted average costs for producing all cast polished plate glass both in the United States and in Belgium.

In further illustration of the difficulty of obtaining costs of production of the three sizes of glass mentioned in said paragraph 222, the commission, in its report, recites the method of production ordinarily employed, as follows:

*Processes of production.*—Both in the United States and in Europe plate glass has been for years and still is produced by the process of pouring or casting from a crucible upon a table sufficient molten glass to form one large sheet when rolled out flat. The rough sheets of glass thus formed are annealed by conveying through a practically continuous series of five ovens and through a long lehr, with gradually reducing temperatures. Afterwards they are inspected for the more obvious defects, and those that pass inspection are mounted in plaster, several of them at one time, upon a circular table, subsequently made to revolve. There they are ground and polished, and thereafter are again inspected for the great number of possible defects, the defects found being marked so as to be apparent to the cutter. Finally the inspected sheets are cut into as many commercial sizes as can be obtained by cutting around the defects. The final result is a number of cut sheets of varied shapes and areas, some of them of high value, because of the great demand for them, and some of low value, because the supply exceeds the demand. The wholly rejected portions of the ground and polished sheets are remelted. This series of operations constituting the prevailing method of manufacture is sometimes called the discontinuous process or old process, by reason of the initial operation of pouring or casting one rough plate at a time.

It also appears from the report that whether the discontinuous process, or the newer continuous process is employed, the cutting out of defects is required, so that it appears to be very difficult to ascertain separately the cost of producing any particular part of the final commercial product.

In view of the facts ascertained by the commission, the commission finally concluded:

* * * the method of equalizing ascertained differences in costs of production to be applied in this investigation is to increase each of the rates by the percentage that the ascertained difference in cost exceeds the weighted average duty collected during the period covered by the investigation. This percentage is 26.2, which, added to the rates of duty for the several brackets, increases the rates to 15.78 cents per square foot for sizes not exceeding 384 square inches, 18.93 cents per square foot for sizes above 384 square inches and not exceeding 720 square inches, and 22.08 cents per square foot for sizes above 720 square inches. A uniform differential corresponding to the existing differential in paragraph 222 of the tariff act of 1922 will be maintained by the following rates:

|  | Cents per square foot |
|---|---|
| Sizes not exceeding 384 square inches | 16 |
| Sizes above 384 square inches and not exceeding 720 square inches | 19 |
| Sizes above 720 square inches | 22 |

It has been held in many cases that, prior to the issuance by the President of a proclamation under said section 315, there must be an investigation by the commission under the provisions of said section. *Hampton, Jr., & Co.* v. *United States,* 14 Ct. Cust. Appls. 350, 368, T. D. 42030, aff. in 276 U. S. 394; *Foster & Co. (Inc.) et al.* v. *United States, supra; United States* v. *Fox River Butter Co.,* 20 C. C. P. A. (Customs) 38, T. D. 45675, Cert. Den. 287 U. S. 628; *Norwegian Nitrogen Products Co.* v. *United States,* 20 C. C. P. A. (Customs) 27, T. D. 45674, aff. in 288 U. S. 294; *United States ex rel. Norwegian Nitrogen Products Co.* v. *United States Tariff Commission,* 274 U. S. 106.

Was such an investigation of costs of production of plate glass of the kind described in said paragraph 222 held by the commission in this case? We are not here concerned with the correctness of the conclusions of the commission on the facts before it or as to whether errors of law in the course of a proper investigation were committed by the commission. These are matters over which we have no jurisdiction in this proceeding. *Foster & Co. (Inc.) et al.* v. *United States, supra; Norwegian Nitrogen Products Co.* v. *United States, supra:*

* * * The Congress, of course, contemplated that the Tariff Commission would make full, fair, and impartial investigations to the end that the President might be fully advised and the purposes of the law consummated. Nevertheless, neither the Customs Court nor this court was given authority to revise the proceedings of the commission, or to control the scope of its investigations. However, the Customs Court, and, on appeal, this court have authority to review those proceedings for the purpose of determining whether a legal investigation had been made.

*United States* v. *Fox River Butter Co., supra.* See, also, *Akawo & Co. et al.,* 23 C. C. P. A. (Customs) 75, T. D. 47737, 77 F. (2d) 660.

It is quite evident that such an investigation was had. The report discloses quite clearly that the commission was investigating

and attempting to report to the President every fact which might be found which would throw light upon the whole subject matter included in said paragraph 222, including the costs of production of the specific sizes named in the paragraph. The commission gathered a vast mass of information which must have been valuable as an aid to the President in making his finding and proclamation. That the commission was attempting to ascertain whether there were any differences in costs of production between the various sizes of glass mentioned in paragraph 222 is obvious from its statement as to the condition of the exporters' books, hereinbefore quoted.

We come to the conclusion that the proclamation of the President cannot be said to be void because of lack of a proper preceding hearing by the commission. The commission, under the Tariff Act of 1922, was not required to *ascertain* the difference of costs of production. It was only commanded to conduct an "investigation." The ascertainment of such differences of costs of production was for the President. In doing so, he was not bound by the report of the commission. He might get his information elsewhere. To insist upon an "ascertainment" by the commission was to attempt to write into the statute something which was not there.

It is argued that a contrary view is announced by the Supreme Court in *United States ex rel. Norwegian Nitrogen Products Co., Inc. v. United States Tariff Commission, supra,* where Mr. Justice Stone, delivering the opinion of the court, stated:

The Tariff Act of September 21, 1922, c. 356, § 315, 42 Stat. 858, 941, vested in the President the power to adjust tariff duties so as to equalize differences in costs of production here and abroad of articles wholly or in part the growth or product of this country, whenever an investigation by the Tariff Commission should reveal disparate costs.

This, it is said, is a holding that the report of the commission must disclose the facts upon which the President must act.

It will be observed that immediately following the statement above quoted, the court proceeds:

Such *investigation* is made a prerequisite to action by the President in proclaiming changes of rates. (Italics are ours.)

We are of opinion that it was not the intent of the Supreme Court in the above-quoted portions of the opinion in the case last above cited, to hold that unless the commission disclosed the differences of costs of production, the President could not act. Such a view is absolutely inconsistent with the expression of said court in *Norwegian Nitrogen Products Co. v. United States, supra,* where, in discussing the distinction between advisory commissions and those which may make mandatory orders, the court said:

\* \* \* Whatever the appropriate label, the kind of order that emerges from a hearing before a body with power to ordain is one that impinges upon legal rights in a very different way from the report of a commission which merely

investigates and advises. The traditionary forms of hearing appropriate to the one body are unknown to the other. What issues from the Tariff Commission as a report and recommendation to the President, may be accepted, modified, or rejected. If it happens to be accepted, it does not bear fruit in anything that trenches upon legal rights. No one has a legal right to the maintenance of an existing rate or duty. * * * ·

Obviously, therefore, it is not a tenable proposition that the President may not make a valid order unless the commission has revealed "disparate costs," in its report.

In view of our conclusion that a prior investigation was had by the commission under said section 315, it becomes immaterial to inquire as to the two collateral points so vigorously urged by counsel for appellant, namely, that the trial court was in error in holding that the report of the commission "is just as immaterial as it was in the Foster case," and that *Foster & Co. (Inc.) et al.* v. *United States*, 20 C. C. P. A. (Customs) 15, T. D. 45673, is *stare decisis*. If it were conceded that the trial court was in error in both holdings, which we do not hold, the conclusion of this court would be the same, on the merits.

The judgment of the United States Customs Court in overruling the protest, therefore, should be and is *affirmed*.