BATA SHOE CO. *v.* UNITED STATES [1]

[1] C. D. 45.

190

United States Customs Court, First Division

(Decided October 17, 1938)

*Strauss & Hedges* (*John Francis Strauss, Allan R. Brown,* and *Eugene F. Blauvelt* of counsel) for the plaintiff.
*Joseph R. Jackson,* Assistant Attorney General (*Marcus Higginbotham, Jr.,* special attorney), for the defendant.

Before McClelland, Sullivan, and Brown, Judges; Brown J., concurring

McClelland, Presiding Judge: The merchandise which is the subject of this protest consists of what are known as McKay sewed shoes which were assessed with duty at the rate of 30 per centum ad valorem under paragraph 1530 (e) of the Tariff Act of 1930 as amended by the Presidential proclamation published in T. D. 45311. The claims in the protest as originally filed within the statutory time allowed therefor after the liquidation of the entry covering the involved merchandise, were as follows:

\* \* \* The reasons for objection, under the Tariff Act of June 17, 1930, are as follows:

Said merchandise is covered by, and is dutiable under, Par. 1530 (e) at only 20% ad val., or at only 10% ad val. by virtue of the Presidential Proclamation of December 2, 1931 (T. D. 45311). If said merchandise is not dutiable at 10% ad val. as above claimed, it is further and alternatively claimed that any order, finding, or proclamation, including the Presidential Proclamation aforesaid, authorizing or purporting to authorize the imposition of any higher duty than that provided in said Par. 1530 (e) or in effect changing the classification provided

in said Par. 1530 (e), is illegal, null, and void. It is not warranted by Section 336 or other provision of law. The duty fixed in said Par. 1530 (e) equalizes the difference in cost of production, in the United States and in the principal competing country, of the merchandise covered by the classifications of said Par. 1530 (e). In any event any statute purporting to authorize the issuance of any order, finding, proclamation, or other act raising or purporting to raise any duty or changing or purporting to change any classification fixed in said Par. 1530 (e) is illegal, unconstitutional, null and void. It is unconstitutional in that the enactment of such provision is beyond the powers granted to Congress by the Constitution of the United States, in that it constitutes the taking of the property of the citizen without due process of law and in that it constitutes an unlawful delegation of the taxing power. You should reliquidate in accordance with the above claims.

Subsequently, and under the provision in section 518 of the Tariff Act of 1930 and rule 9 of this court, a motion to amend the said protest was, over objection by defendant's counsel, granted, such amendment, so far as pertinent, being as follows:

Now come Strauss and Hedges, Attorneys for the above named and, prior to the first docket call of the above entitled protest, move the Court for an order directing that said protest be amended as follows:

By adding the following after the sentence "It is not warranted by Section 336 or other provision of law":

The duty is not expressly fixed by statute within the meaning of said Section 336.

After the next sentence insert the following:

The investigation, hearing, finding, and report of the Tariff Commission are based on a wrong principle, contrary to law, illegal, null, and void. Error is specifically alleged in that the actual values at the time of exportation or importation were not taken; that values at an earlier date were taken; that values as of a period prior to the passage of the Tariff Act of 1930 were taken; that the cost comparisons were based upon insufficient, improper, and unrepresentative samples; that the cost comparisons were based upon average costs for different merchandise; that the rate of advance in duty was calculated upon average costs for different merchandise; that the segregation of the merchandise into different classes was arbitrary and without authority of law. Error is further specifically alleged in that the actual values upon which duty is taken and the actual duties and taxes paid upon importation of the merchandise are higher than the values, duties, or taxes considered and calculated by the Tariff Commission in comparison of costs. It is further alleged that the "representative period" adopted by the Tariff Commission in its investigation was not in fact or law representative and that the conclusions drawn therefrom are not applicable to or representative of conditions at the time of these shipments.

The appraiser's special report to the collector, which was filed within ninety days after the lodging of the protest, and therefore may be considered as evidence, reads as follows:

The merchandise in question consists of shoes made wholly or in chief value of leather, not specially provided for, sewed or stitched by the process or method known as McKay. It was returned for duty at 30% ad valorem under paragraph 1530 (e) Act of 1930. Note the Presidential Proclamation, T. D. 45311 Note also T. D. 42706.

There is no testimony in the record, only questions of law being involved.

In their order as developed the objections to the collector's classification may be stated and disposed of as follows:

(1) That Senate Resolution 295 of the 71st Congress, second session, which includes "shoes, men's and women's shoes" was illegal. Said resolution reads as follows:

RESOLVED, That the Tariff Commission is hereby directed to investigate the differences in cost of production between the domestic article and foreign article and to report upon the earliest date practicable upon the following articles: Shoes, both men's and women's shoes; furniture, bells; wire fencing; wire netting; cement; hose; shovels; spades; scoops; forks; rakes; scythes; sickles; grass hooks; corn knives; and drainage tools.

This request is made under and by virtue of section 336, and the following sections of the new tariff act, passed and approved on the 17th day of June 1930.

It is urged by plaintiff's counsel that this resolution is void *ab initio* for the reason that it was introduced in the Senate on June 17, 1930, the day on which the Tariff Act of 1930 was approved by the President, but one day before it became operative, and it is contended that there was no statutory authority for the resolution. We find no authority cited to support this contention, but since the resolution was offered on the same day as the tariff act was approved, such approval by the President being at 12:59 p. m., it is a reasonable assumption, inasmuch as it was determined by resolution on the convening of the Senate at the first session of the 71st Congress that the Senate should meet at the hour of 12 o'clock meridian, that Senate Resolution 295 was adopted after the approval of the tariff bill, and we are without doubt that the Senate possessed the unquestionable right to pass any resolution it might desire under section 336 following its approval, regardless of the fact that the tariff act did not become operative until the day following.

(2) The second objection to said Senate Resolution 295 is that while section 336, *supra*, authorizes the investigation of the differences in the cost of production of "any domestic article and of any like or similar foreign article," the Senate Resolution authorized, in addition to shoes, investigations with regard to furniture, bells, wire fencing, wire netting, cement, hose, shovels, spades, scoops, forks, rakes, scythes, sickles, grass hooks, corn knives, and drainage tools, and it is contended that in framing section 336 such blanket resolution was not within the contemplation of Congress.

No authorities are cited in support of this objection, and it is our view that it is untenable and without merit. We can see no valid reason why separate resolutions should have been made with regard to each of the articles named.

(3) The third ground of objection is that the investigation by the Tariff Commission and the proclamation of the President were illegal

for the reason that the McKay sewed shoes in issue are not within the purview of section 336 of the Tariff Act of 1930 inasmuch as they are not subject to changes in rates because they are not expressly provided for. In other words, it is the evident contention here of plaintiff that under the provisions of section 336, *supra*, changes in rates of duty as the result of an investigation by the Tariff Commission and a proclamation of the President can only be made as to articles specifically provided for *eo nomine* in the tariff act.

As in the case of the previous two objections, no authority is cited in support of this contention, and we think Congress manifested no such limitation as thus contended for. The analogous section to section 336 of the Tariff Act of 1930 was section 315 of the Tariff Act of 1922. That section provided for "changes in classifications or increases or decreases in any rate of duty provided in this act," while section 336 (a), *supra*, provides for "increases or decreases in rates of duty expressly fixed by statute (including any necessary change in classification)." Plaintiff contends that the change in language indicates an intent on the part of Congress to confine any change made during the life of the Tariff Act of 1930 to *goods* "expressly provided for." It will be noted that the words "expressly provided for" do not appear in the excerpt quoted above from section 336 (a). The words "expressly fixed by statute" found therein relate to *rates of duty*, and there can be no doubt that as applied to the McKay sewed shoes in issue the rate of duty had been "expressly fixed by statute" under the provision in paragraph 1530 (e) of the Tariff Act of 1930 for "boots, shoes, or other footwear * * * made wholly or in chief value of leather, not specially provided for."

(4) The fourth objection is that the Tariff Commission's investigation, hearing, and report, which formed the basis of the Presidential proclamation, were illegal and therefore invalid.

Five reasons are cited why it is claimed that the Tariff Commission's investigation, hearing, and report were illegal.

The first is "because reasonable public notice was not given as required by section 336," and under this heading it is pointed out that the notice, which is to be found on pages 28 and 29 of the weekly TREASURY DECISIONS dated August 28, 1930, Vol. 58, No. 9, refers only to "boots and shoes" and not to the only class of boots and shoes upon which the rate of duty was raised, i. e., McKay sewed boots and shoes.

In our view the decision of the Court of Customs and Patent Appeals in *Lord & Taylor* v. *United States*, 26 C. C. P. A. 151, C. A. D. 9, is ample authority for holding that the quoted reason for the objection is without merit. Judge Bland, writing the unanimous opinion of the court in that case, said:

The law is well settled that a notice relating to proceedings such as are here under consideration, if sufficient "to excite attention and put the party on his

guard and call for inquiry, is notice of everything to which such inquiry might have led." It follows that when "a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." *United States Trust Co.* v. *David*, 36 App. D. C. 549; *Wood* v. *Carpenter*, 101 U. S. 135. See also *Shaur* v. *Allerton*, 151 U. S. 607, where substantially the foregoing rule was announced under somewhat different circumstances. Also see *Tagg Bros. et al.* v. *United States et al.*, 280 U. S. 420.

Surely a manufacturer or importer of McKay sewed *boots and shoes* should have been placed upon inquiry by a notice relating to a Tariff Commission investigation with regard to boots and shoes.

The second reason given is "because the statutory requirement of the existence of a domestic article comparable with the imported article was lacking." Under this heading plaintiff's counsel state in their brief the following:

> The Tariff Commission's report, page 8, indicates that there is a considerable importation but no domestic production of shoes with molded soles and woven leather uppers. Therefore boots and shoes are not within the purview of Section 336, because the flexible tariff provisions demand the existence of a domestic article the cost of which is to be compared with the foreign article.

In our view it does not follow that because one type of shoe is not manufactured in the United States all boots and shoes are excluded from the purview of section 336, *supra.* That section requires that there be a domestic article the cost of production of which is to be compared to that of a like or similar foreign article. It will be noted that there is no claim that McKay sewed boots and shoes, the type here in issue, were not manufactured in the United States. The objection must fall for lack of merit.

The third reason given is "because the report shows on its face that there was in fact no investigation of at least part of the articles supposed to be under investigation."

We are unable to see any reason why, if the foregoing be true, it should form any basis for holding that the investigation, hearing, and report of the Tariff Commission was illegal as applied to the shoes in this case. It is not disputed that there was an investigation, hearing, and report with regard to the type of shoes here in issue.

The fourth reason given is because "the investigation did not conform to the Senate resolution directing the investigation." It is pointed out that the Senate resolution authorized an investigation with regard to "shoes, both men's and women's shoes," while the notice of the Tariff Commission announced an investigation with regard to "boots and shoes," and that the scope of the latter includes other than men's and women's shoes.

In this connection it is to be observed that under section 336 (a), *supra,* investigations may be made by the Tariff Commission (1) upon request of the President, (2) upon resolution of either or both

Houses of Congress, (3) *upon its own motion*, or (4) when in the judgment of the Commission there is good and sufficient reason therefor, upon application of any interested party. There is nothing in the notice of investigation caused to be published by the Tariff Commission in the weekly TREASURY DECISIONS of August 28 and September 4, 1930, to indicate that insofar as the scope of the investigation exceeded the scope of the Senate resolution which initiated it, such excess was not authorized by the Commission's own motion, and since the Commission had the authority so to do it must be presumed that the Commission acted in accordance with law. Manifestly, insofar as the scope of the investigation was within the scope of the resolution, there can be no objection.

The fifth reason given is "because the requirements of the statute were not complied with." All of the facts alleged under this heading relate to the proceedings had by the Tariff Commission, which, as held by the Court of Customs and Patent Appeals in *William A. Foster & Co., Inc., et al.* v. *United States*, 20 C. C. P. A. 15, T. D. 45673, is not a subject for review by this court.

(5) The fifth objection stated is that "The proclamation of the President relied on herein by the collector was illegal, null, and void because the President never had before him the facts of the investigation by the Tariff Commission even though said investigation were legal." It will be sufficient to say that this objection was considered at the time plaintiff's counsel moved for transfer of the case to Washington, D. C., in order to take the testimony of the Secretary of the Tariff Commission and other witnesses on the question of whether all the facts before the Tariff Commission were submitted by it to the President, our decision thereon being reported in T. D. 48837. For the reasons there given we must hold the objection to be without merit.

(6) The last objection stated is that "Section 336 is unconstitutional in that it is a delegation to the President of the legislative power, particularly the taxing power, it constitutes the taking of the property of the citizen without due process of law and is beyond the powers granted to Congress. The Collector has taken the property of the citizen without due process of law."

The precise issue thus raised was passed upon by this court and the Court of Customs and Patent Appeals, and the latter tribunal, in *United States* v. *Sears, Roebuck & Co.*, 20 C. C. P. A. 295, T. D. 46086, squarely held that the provisions of section 336, *supra*, do not purport to delegate legislative power to the President.

For the foregoing reasons all of the claims stated in the protest must be overruled and the decision of the collector affirmed. Judgment will issue accordingly.

CONCURRING OPINION

BROWN, Judge: The plaintiff herein contends as follows:

(1) That the entire Flexible Tariff proceeding in this matter is illegal, null and void because the Senate resolution authorizing the investigation by the Tariff Commission is illegal.

As the action of the Tariff Commission in recommending to the President changes in statutory tariff classifications and rates may be had of its own motion without any Senate resolution asking for it, the fact that the Senate resolution asking for action was illegal would have no effect upon the legality of the action taken.

(2) The McKay sewed shoes at bar are not within the purview of section 336 of the Tariff Act of 1930 for changes in the statutory tariff duty because they are not expressly provided for, that is "expressly fixed by statute."

It is true that the statutory provision which was changed, paragraph 1530 (e), is a blanket provision reading as follows:

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem.

And the newly written Presidential paragraph carved out of that blanket clause reads as follows:

An increase in the rate of duty expressly fixed in paragraph 1530 (e) of Title I of said act on boots and shoes, made wholly or in chief value of leather, not specially provided for, *sewed or stitched by the process or method known as McKay,* from 20 per centum ad valorem to 30 per centum ad valorem. [Italics mine.]

It is claimed that McKay shoes are not "expressly fixed by statute" and that this point has never been passed on by the courts. However, in *United States* v. *Sears, Roebuck & Co.,* 20 C. C. P. A. 295, T. D. 46086, the court of appeals passed upon a very similar situation and incidentally, to arrive at their conclusion, must have construed the expression "expressly fixed by statute" (new language in the Tariff Act of 1930) as having a different effect than the effect claimed for it here, or rather, as having no effect at all. There the statutory provision, blanket paragraph 397, Tariff Act of 1930, read:

PAR. 397. Articles or wares * * * composed wholly or in chief value of iron, steel, lead, copper, brass, nickel, pewter, zinc, aluminum, or other metal, but not plated with platinum, gold, or silver, or colored with gold lacquer, whether partly or wholly manufactured, 45 per centum ad valorem.

The Presidential paragraphs there written, carved out of the above blanket paragraph, read as follows:

An increase in the rate of duty expressly fixed in paragraph 397 of Title I of said act on woven-wire fencing and woven-wire netting, all the foregoing composed of wire smaller than eight one-hundredths and not smaller than three one-hundredths of an inch in diameter, coated with zinc, or other metal before weaving, from 45 per centum ad valorem to 50 per centum ad valorem;

And an increase in the rate of duty expressly fixed in paragraph 397 of Title I of said act on woven-wire fencing and woven-wire netting, all the foregoing composed of wire smaller than eight one-hundredths and not smaller than three one-hundredths of an inch in diameter, coated with zinc or other metal after weaving, from 45 per centum ad valorem to 60 per centum ad valorem.

The plaintiff claims that the meaning of the new language in section 336 "expressly fixed by statute" was not passed on in that case and asks us to decide here that those words exclude these McKay shoes from the operation of section 336 because they were not expressly named in the statutory tariff.

It is true that in the Sears, Roebuck case, supra, Judge Lenroot does not mention these words and in the appellee's original brief they are not relied on. However, in the appellee's brief asking for a reargument of the case they are specially mentioned and relied on. That motion for reargument was unfortunately overruled without opinion on February 27, 1933. The effect of this is that our court of appeals evidently did not think the addition of these new words "expressly fixed by statute" changed the effect of what they had decided the meaning of the flexible provision in the Tariff Act of 1922 to be; and that section 336 of the Tariff Act of 1930 permitted the increase of duty on one article in a blanket paragraph by means of the flexible process by writing a new executive paragraph referring to it alone.

Certiorari to the Supreme Court was applied for by Sears, Roebuck & Co., the appellee in that case before the Court of Customs Appeals. It was denied without opinion in spite of the fact that it involved an important new constitutional question and an important new question of power over the construction of these new words in section 336. Both questions involved far reaching results affecting every customs taxpayer in the United States.

Ordinarily that would mean nothing in regard to the merits of the case, as Mr. Justice Holmes said in United States v. Carver, 260 U. S. 482, at page 490:

* * * The denial of a writ of certiorari imports no expression of opinion upon the merits of the case, as the bar has been told many times.

Mr. Justice Holmes repeated this exact language in Atlantic Coast Line v. Powe, 283 U. S. 401, bottom of page 403.

Mr. Chief Justice Taft also said in Magnum Import Company, Inc. v. Coty, 262 U. S. 159, at page 163:

* * * The jurisdiction to bring up cases by certiorari from the Circuit Courts of Appeals was given for two purposes, first to secure uniformity of decision between those courts in the nine circuits, and second, to bring up cases involving questions of importance which it is in the public interest to have decided by this court of last resort. [Emphasis mine.]

These expressions by the Supreme Court, however, can have no application to their denial of certiorari in the *Sears, Roebuck* case, *supra*, because of the overwhelming importance of the constitutional and power questions involved therein affecting every taxpayer in America. The irresistible inference must therefore be drawn that in denying certiorari in the *Sears, Roebuck* case the Supreme Court intended to dispose of the important questions it involved without the assistance of oral argument. That naturally constrains us to follow the court of appeals' holding in the *Sears, Roebuck* case where the opinion ignored the new language of the act of 1930, treating it as having no effect.

The third contention of the plaintiff is that the Tariff Commission's investigation was not in conformity with the statute and therefore illegal, and that such an investigation was not passed upon by the President in accordance with the requirements of the law. The investigation is part of the *internal* legislative process, and, therefore, not subject to judicial review, however arbitrarily conducted. Likewise, the reporting to the President, however imperfectly or incompletely reported, and the President's action in dealing with the report, are parts of the *internal* legislative process as to which a complete and final legislative discretion was committed by Congress to the Tariff Commission and the President, inherently and necessarily not subject to judicial review because it is the legislative process of levying a tax. The President might not even read the Tariff Commission's report. He might ignore parts of it and consider only parts of it. Yet no court could interfere with such exercise of his discretion.

True, the *Hampton* case holds that it was not executive legislation and therefore constitutional. But the later case of *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, admits it to be executive legislation, in holding that the hearing provided for before the Tariff Commission was a mere "legislative" hearing and in no sense a "judicial" hearing, like that involved in a law suit. On page 305 Mr. Justice Cardozo says:

* * * What is done by the Tariff Commission and the President in changing the tariff rates to conform to new conditions is in substance a delegation, though a permissible one, of the *legislative process*. [Emphasis mine.]

On page 315, 316 he says:

* * * In the same tariff act that makes provision in these general words for a hearing by the Commission as a step in the development *of the process of legislation*, there is another section prescribing the remedy available to an importer *after the legislative process has been completed*. [Emphasis mine.]

Then after setting out the judicial review given importers by the reappraisement section, in contrast to the absence of judicial review of the legislative flexible process, he says:

This is the way that Congress spoke when it wished to attach to an administrative proceeding the incidents of a trial in court.

Returning to the flexible legislative process, he says on page 318:

\* \* \* No one has a legal right to the maintenance of an existing rate or duty. Neither the action of Congress in fixing a new tariff *nor that of the President in exercising his delegated power* is subject to impeachment if the prescribed forms of *legislation* have been regularly observed. [Emphasis mine.] It is very different, however, when orders are directed against public service corporations limiting their powers in the transaction of their business. They may be challenged in the courts if the effect is to reduce the charges to the point of confiscation. *Smyth* v. *Ames*, 169 U. S. 466. They may be challenged for other reasons when they are without evidence supporting them and are merely arbitrary edicts. [Emphasis mine.]

The plaintiff's fourth contention is that the statement on page 8 of the Tariff Commission's report that:

There is also a considerable importation but no domestic production of shoes with molded sides and woven leather uppers \* \* \*

shows that there is no domestic production and without that there could be no comparison between foreign and domestic costs and that therefore the finding was void. That statement, however (assuming the report was admissible in evidence), is contained in a reference to other varieties of shoes in which there was no change in the rate. In that connection it should be stated that determination as to whether or not there is a domestic article for cost comparison is part of the *internal* process which is committed to the arbitrary and uncontrolled discretion of the President and Tariff Commission without judicial review.

The plaintiff's fifth contention is that, although the investigation was supposed to cover boots and shoes generally, the report shows on its face that the Commission made no investigation of boots and shoes generally, but simply of certain arbitrarily selected classes of boots and shoes.

In support of this, it quotes certain sections of the report (assuming it was admissible in evidence) which plainly show the investigation was limited to turned shoes, McKay sewed shoes, and welt shoes, the only shoes on which duties were investigated or changed. The arbitrary uncontrolled discretion to do this is plainly bestowed on the Tariff Commission and President. This sort of discretion in the legislative process of levying a tax is part of the internal process and as such not subject to judicial review.

This with many other similar equally arbitrary legislative delegated guess-work discretions were all brought to the attention of the Supreme Court by the petitioner's brief in the *Hampton* case without preventing the holding that the act was constitutional. The *Norwegian Nitrogen Products* case also now shows that they are plainly legislative in character as before pointed out.

The plaintiff's sixth contention is that the finding is void because Senate Resolution 295 covered shoes, "both men's and women's shoes," while the Tariff Commission's investigation purported by the notice of hearing to cover only shoes in chief value of leather. It might have been added the actual investigation, if the report is to be considered as evidence, actually covered only welt shoes and turned shoes and McKay sewed shoes.

The answer to this is that the Commission's power is not derived from the Senate Resolution but from the statute, section 336, which commits all this to the Commission as part of its arbitrary uncontrolled legislative discretion in executing the internal flexible process.

The plaintiff's seventh contention is that the finding is invalid because of the arbitrary segregation of the merchandise into different classes and the arbitrary selection of samples. All this again is part of the discretionary internal legislative process.

The plaintiff's eighth contention is that the finding is void because the President never had before him the facts of the investigation by the Tariff Commission even though said investigation was legal. If that were true and had been proved, it would not vitiate the President's finding and proclamation of a new rate of tax.

The Tariff Commission can make as complete or incomplete investigation as they like and no court may interfere. The President can take what they give him, however incomplete, and adopt the suggestions for changes in the tariff rates, or refuse to adopt them, and no court can interfere, provided some sort of investigation is made, some sort of "legislative" hearing had, and some sort of affirmative or negative action taken by the President. These are all the statutory requirements.

The time to have thought of such things and their inevitable consequences to our system of democratic representative Government was when the constitutionality of the flexible tariff was under discussion in the *Hampton* case. The arbitrary discretionary guess-work character of the flexible tariff process was as evident and apparent then as it is now.

The last contention of the plaintiff is based upon the language of Judge Graham in the *Hampton* case, 14 Ct. Cust. Appls. 350, T. D. 42030, at page 367:

It is next contended by appellant that the President can not be haled into court and sued by a citizen; that his acts under section 315 are not reviewable by the courts; that the acts of an administrative officer exercising delegated power must, if they are held to be valid, always be so subject to review; and that the President may, under this section, practically rewrite a tariff law in form and in substance, without accountability to anyone. *If this be true, it goes without saying that the section can not be sustained.* [Emphasis mine.]

adding that under the statutes the President's action is ministerial only, and "subject to review by the courts."

Thus it is attempted to bring the points heretofore made concerning the execution of the internal flexible process under our judicial cognizance for review and correction by us.

However, whatever weight that statement may have temporarily had, it is overruled and put aside by the Supreme Court's decision in *Norwegian Nitrogen Products Co.* v. *United States*, 288 U. S. 294, as above referred to. That case held that the hearing was a mere "legislative" hearing because the whole executive process was a *legislative* process. The conclusive inference from that decision by Mr. Justice Cardozo is that as long as the external statutory requirements for a legislative investigation with a legislative hearing, with notice thereof, etc., is complied with, the President can do exactly what Judge Graham stated:

\* \* \* practically rewrite a tariff law in form and in substance, without accountability to anyone.

in executing the flexible tariff process.

. As was said in the *American Stores Co.* v. *United States*, 58 Treas. Dec. 643, T. D. 44392, a holding (affirmed on principle by Mr. Justice Cardozo's language in the *Norwegian Nitrogen Products Co.* case):

Those who successfully asserted the revolutionary doctrine that taxation (the power to destroy) may be imposed by Executive fiat and discretion, might be glad to see the disastrous effects of such a doctrine softened and mollified, by setting up, by construction, a judicial review of such executive discretion, i. e., by waiving a magic wand which will convert the political act of fixing the future tax rate into a law suit, by making justiciable that which is inherently nonjusticiable. But the consequences of such a construction would be too great. It cannot be done by setting up a judicial Council of Elder Fathers to legislate from the bench. That would be a further step in the demolition of our constitutional division of powers upon which the safety and security of our unique form of representative government rests.

Those who talk about levying customs (or other) taxes in the same way that railroad charges are fixed by a commission are simply asserting the impossible. There is no likeness between the two processes. They cannot by legal magic be transformed into the same thing.

Any argument derived from the consequences of permitting taxation by Executive fiat and discretion, within the limits of the internal flexible process, could only have been advanced in the Hampton case itself in support of the claim that the Constitution limited the exercise of such legislative and taxing discretion to Congress alone. It was so advanced and distinctly overruled. It can have no weight now to soften these consequences by having the courts take part in legislation, under the guise of reviewing a so-called administrative act which is really political in character, i. e., the political act of fixing the amount of the future tax rate, which does not have to be reasonable, and can be both arbitrary and confiscatory.

If the constitutional provisions, which confine legislative power and taxing power to the people's representatives in Congress, may be avoided by the assumption that the President merely acts under congressional direction intelligently expressed, so that the action of the President in proclaiming a new customs tax became, in legal effect, *their* act and not *his* act, the inevitable legal consequences must ensue. If these consequences could not be considered in the *Hampton* case as a reason why the flexible tariff was unconstitutional, they cannot be considered now as a reason for creating a judicial review of a purely political act.

If the Congress is really acting through the President then it is the legislative political discretion of the Congress itself for which a judicial review is here sought. Judicial control of the scope and conduct of the Tariff Commission's investigation, and of its method of reporting to the President and of his action upon their report, would amount to judicial control and regulation of a congressional investigation as well as over the Commission's method of reporting and over the President's way of treating and considering its recommendations which the statute gives him discretionary authority to adopt or ignore according to his judgment.

No matter who performs it, fixing the amount of the future tax rate is a purely political act, legislative in kind. There is no candid escape from that mental conclusion. Consequently, if the courts can supervise the conduct of it and correct such performance, they perform a political act.

If the court can say whether the investigation and the exchange of information between the Commission and the President is fairly and justly performed, or quash the resulting levy if, in the court's opinion, it is not fairly and justly performed, the court controls the conclusion and acts politically. By so doing, the court legislates, i. e., takes part in the political act of fixing the amount of the future tax rate, departs from its high estate and independent position in the Government by thus taking part in political action.

In the argument of the *Norwegian Nitrogen Products* case plaintiff's counsel made no attack upon the constitutionality of the flexible tariff which he described in the statement quoted in Judge McClelland's opinion below as his own handiwork (R. page 49). He had also previously defended its constitutionality in the *Hampton* case. On page 36 of his brief before the Court of Customs and Patent Appeals he strongly relied upon the statement of Presiding Judge Graham in the *Hampton* case as follows:

It is next contended by appellant that the President can not be haled into court and sued by a citizen; that his acts under section 315 are not reviewable by the courts; that the acts of an administrative officer exercising delegated power must, if they are to be held valid, always be so subject to review; and that the President

may, under this section, practically rewrite a tariff law in form and in substance, without accountability to anyone. *If this be true, it goes without saying that the section can not be sustained.*

Plaintiff's counsel in the case at bar also quotes and relies upon that statement.

Petitioner's counsel in the *Norwegian Nitrogen Products* case emphasized and stressed Presiding Judge Graham's further statement where he described the President's action, under the flexible tariff as administrative merely and likens it to the appraisement of the value of a parcel of merchandise as follows:

> * * * *But whatever the legislative purpose may have been, the acts of the President thereunder are entitled to no greater significance and should be measured by no other rule than that to be given and used in considering the acts of any other fact-finding official or board which the Congress may have named.*
>
> * * * * * * *
>
> * * * We are unable to see why any different rule of law should be applied to the President's finding of facts under section 315 than the one applied to the finding of valuation by an appraiser of merchandise at our ports. In such cases, while the courts have held the finding of valuation made by the appraiser to be conclusive, if he proceeds upon a wrong principle, contrary to law, his acts are subject to judicial control and correction. (Petitioner's brief pp. 58 & 59 before the Supreme Court.)

The Supreme Court, however, adopted none of this. On the contrary, they held that the internal flexible executive process, including the investigation and hearing, was a legislative process, with, consequently, little or no judicial review.

In the *Hampton* case the constitutionality of the flexible tariff was sustained because it was not legislation, and could, therefore, be performed by executive authority. Later, in the *Norwegian Nitrogen Products* case, the internal flexible process was held to be a legislative process and therefore subject to practically no judicial review or correction.

Whatever difficulty there may be in reconciling these decisions, we are, of course, bound by the latest pronouncement of the Supreme Court on the subject.

In conclusion it is noted that in *Janssen* v. *United States*, 61 Treas. Dec. 47, T. D. 45385, being an opinion denying a motion to amend at the San Francisco docket by adding a claim to the protest which alleged that the Tariff Commission and President had proceeded upon a wrong principle contrary to law, the question before us was discussed and the difference pointed out between such a claim and a protest against the legality of an appraisement or reappraisement on like grounds as follows:

> When appeal is made to reappraisement, or when, on protest, the legality of an appraisement, or a reappraisement, of imported merchandise is contested before

the courts, the importer is merely insisting that the law, as it exists, be correctly applied to his importation. He has a legal right to have the law rightly enforced as it affects him and his property.

When a shipper attacks a carrier's rate before the Interstate Commerce Commission, or attacks their findings before the courts, he is asserting his legal right to "a reasonable charge for services rendered," that is, asking that the rule of law which requires a reasonable rate shall be enforced as to him or his property.

But when an importer, domestic manufacturer, or consumer appears before the Tariff Commission to ask them to change, or not to change, an existing tariff tax, he is asserting no legal right whatsoever. He has no legal right either to keep the existing rate of taxation or to compel the levy of a higher or lower rate of taxation.

True, he has a statutory right under section 315 to insist on an investigation and to appear at the hearing and offer evidence supporting his view that there should or should not be a change in the rate, and to argue for or against it. But that is as far as the statutory right goes.

No one can litigate the question as to whether the application of the formula requires, or does not require, a change in the statutory rate, or whether the formula requires an increase or decrease. No legal right is infringed or legal duty broken when, within the terms and limits of the statute, the President, with the assistance of the Tariff Commission, exercises the power conferred. That power to carry out the process is left by the express terms of the law to the President after there has been an investigation by the commission.

The date of this ruling was January 7, 1932, while the Supreme Court's decision in the *Norwegian Nitrogen Products* case asserting the same principle was February 6, 1933.