UNITED STATES *v.* FOX RIVER BUTTER CO. (No. 3438) [1]

FOX RIVER BUTTER CO. *v.* UNITED STATES (No. 3442) [1]

[1] T. D. 45675.

United States Court of Customs and Patent Appeals, May 2, 1932

*Charles D. Lawrence*, Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States.

*Walden & Webster* (*J. L. Klingaman* of counsel) for importer.

*Marion De Vries, amicus curiae.*

[Oral argument October 6, 1931, by Mr. Lawrence, Mr. Klingaman, and Mr. De Vries.]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, and GARRETT, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

These are cross-appeals from a judgment of the United States Customs Court.

Certain imported Swiss cheese was assessed for duty by the collector at the port of New York at 37½ per centum ad valorem under paragraph 710 of the Tariff Act of 1922, as modified by a presidential proclamation dated June 8, 1927, T. D. 42251, 51 Treas. Dec. 934, issued under, and by authority of, the so-called flexible tariff provisions—section 315 of that act.

Paragraph 710 reads:

PAR. 710. Cheese and substitutes therefor, 5 cents per pound, but not less than 25 per centum ad valorem.

The rates of duty provided in paragraph 710 were increased, by the proclamation of the President, on—

cheese by whatever name known, having the eye formation characteristic of the Swiss or Emmenthaler type (within the limit of total increase provided for in said act), from 5 cents per pound, but not less than 25 per centum ad valorem, to 7½ cents per pound, but not less than 37½ per centum ad valorem.

The importer protested, claiming the merchandise dutiable at 5 cents per pound, but not less than 25 per centum ad valorem, or, in the alternative, at 7½ cents per pound.

The court below, Cline, Judge, dissenting, sustained the protest, holding the merchandise dutiable at 25 per centum ad valorem.

In appeal No. 3438 the Government challenges the correctness of the judgment of the court below sustaining the protest and holding unconstitutional the provisions of section 315 of the Tariff Act of 1922, conferring upon the President of the United States the authority to "determine and proclaim the changes in classifications or increases or decreases in any rate of duty," necessary to equalize the differences in the costs of production of like or similar articles produced in the United States and in competing foreign countries. It is also contended by counsel for the Government that the protest did not raise the question of the constitutionality of the provisions of section 315, and that, therefore, the court below had no authority to consider that question.

In appeal No. 3442, the importer, although concurring in the views expressed by the court below regarding the constitutionality of the provisions in question, and satisfied with the judgment, both as to form and substance, nevertheless contends that, if the court erred in holding the provisions of section 315 unconstitutional, it also erred in not holding that the President was without statutory

authority to increase the minimum 25 per centum ad valorem rate, provided in paragraph 710, to 37½ per centum ad valorem, and in not holding that the Tariff Commission had failed to make an investigation, as required by the statute. It is further contended that the President had no authority to change the language of a paragraph of the tariff act; that, by increasing the rates of duty on—

cheese by whatever name known, having the eye formation characteristic of the Swiss or Emmenthaler type,

the President did more than merely raise the rates of duty—he wrote an entirely new paragraph; and that, by so doing, he prevented the application of the doctrine of commercial designation and changed the classification of the involved merchandise.

But relatively few paragraphs in the Tariff Act of 1922 provided a separate rate of duty for each imported article covered thereby.

A large majority of the dutiable paragraphs of the 1922 tariff act contained one or more provisions, each of which covered many articles at the same rate or rates of duty. Accordingly, if the President lacked authority to describe the particular article or articles on which the rate or rates of duty were to be increased or decreased, the increased or decreased rates, as to each of those paragraphs, would have applied to all, or to none, of the articles covered by a provision fixing a rate or rates of duty. Obviously, it was not the purpose of the Congress to require the President to change the classification, or increase or decrease the rates of duty, on *all* articles, covered by a tariff provision, bearing the same rate or rates of duty, in order that the differences in the cost of production of *one or more of such articles* might be equalized.

Section 315 (c) provided that no proclamation should be issued by the President until an investigation had been made by the Tariff Commission. Accordingly, if the contention of counsel for importer is sound, the President was powerless to act until the commission had made an investigation of *all* articles covered by a provision fixing a rate or rates of duty, and, if he had found that, as to *some* of those articles, no changes in classification, nor increases nor decreases in rates of duty, were required, he was without authority to act as to *any* of the other articles, even though the investigation showed that an increase or a decrease of rates was necessary. The Congress, of course, never intended that the constitutional and "intelligible plan" to vary the customs duties according to changing conditions of production at home and abroad, provided by section 315, should be so construed.

Section 315 (a) provided that the President should—

determine and proclaim the changes in classifications or increases or decreases in any rate provided in this Act shown by said ascertained differences in such costs of production necessary to equalize the same.

42

That section also provided—

That the total increase or decrease of such rates of duty shall not exceed 50 per centum of the rates specified in Title I of this Act, or in any amendatory Act.

In view of the fact that section 315 (c) prohibited the—

transfer of an article from the dutiable list to the free list or from the free list to the dutiable list,

and also prohibited "a change in form of duty," it would seem that the purpose, in providing that the classification of an article might be changed, was to afford an additional means whereby the rate or rates of duty applicable to such article or articles might be increased or decreased. Accordingly, we think it is clear from the plain language of the statute that the President had the power to change the classification of an article and to increase or decrease the rates of duty provided in that act, so long as such rates were not increased or decreased in excess of 50 per centum. The power to describe the particular article or articles on which the rate or rates of duty were to be increased or decreased by the President is necessarily implied from the language of section 315 (a). That section conferred upon the President the power to "determine and proclaim the changes in classifications or increases or decreases in any rate of duty," provided for in the dutiable list of that tariff act, necessary to equalize the differences in costs of production of like or similar articles produced in the United States and in competing foreign countries. Obviously, if the provisions of the statute in question were intended to be given any force and effect, the power to change classifications, or to increase or decrease the rate or rates of duty, must have carried with it the power to describe the articles on which the rate or rates of duty were to be increased or decreased. Such power was not legislative in character. It was but the necessary means to an end—the means necessary to carry out the constitutional and "intelligible plan" of the Congress. *Hampton, Jr., & Co.* v. *United States*, 14 Ct. Cust. Appls. 350, T. D. 42030, affirmed in 276 U. S. 394.

It is argued by counsel for the importer that the issues before this court and the Supreme Court in the *Hampton* case concerned merely the power of the President to change a rate of duty, and that the involved issues were not considered in that case. Although the power of the President to describe the particular article or articles on which a change of classification, or an increase or a decrease of the rate or rates of duty, was applicable, was not discussed by this court nor by the Supreme Court in that case, nevertheless, such power was so plainly necessary, if the "intelligible plan" of the Congress was to be carried out, that it must have been given consideration.

Furthermore, it may be said that in the instant case there is no evidence of record to indicate that the language "by whatever name

known," used by the President in his proclamation, changed the classification of the involved merchandise. Nor does it appear that the President did anything more than increase the rates of duty on *certain kinds of cheese* covered by paragraph 710. Holding these views, we deem it unnecessary to consider the argument, so earnestly urged by counsel for the Government, that the court below had no authority, in view of the claims made in the importer's protest, to consider the question of the constitutionality of the provisions of section 315.

The next question for our consideration is as to the authority of the President to raise the minimum 25 per centum ad valorem rate provided in paragraph 710.

Counsel for importer contends that the sole purpose of the Congress in enacting the provisions of section 315 was to provide a convenient plan for equalizing the varying differences in production costs of foreign and domestic articles; that the minimum 25 per centum ad valorem rate provided in paragraph 710 was merely a revenue-raising rate and was not intended to equalize the differences in production costs of foreign and domestic cheese, and that, therefore, the President had no authority to increase the minimum ad valorem rate for the purpose of equalizing the differences in such costs.

It appears from the Summary of Tariff Information, 1921, that, at that time, there were more than 150 varieties of cheese, covering a wide range in values. In view of this fact, we think it is fair to say that the 25 per centum ad valorem rate was intended to apply particularly to the more expensive cheese, and that the differences in cost of production were intended by the Congress to be equalized thereby. There is nothing in the paragraph, nor in its legislative history, to indicate the contrary. But, however that may be, the avowed purpose of the Congress in enacting the Tariff Act of 1922 was—

To provide revenue, to regulate commerce with foreign countries, to encourage the industries of the United States, and for other purposes.

The congressional plan, as set forth in the provisions of section 315, was intended to equalize the differences in the costs of producing dutiable articles in foreign countries and in the United States, not only for the purpose of securing revenue—

but at the same time [to] enable domestic producers to compete on terms of equality with foreign producers in the markets of the United States.

*Hampton, Jr., & Co.* v. *United States, supra.* Furthermore, section 315 (c) provided that, whenever it was provided in any paragraph of that act that the—

duty or duties shall not exceed a specified ad valorem rate  *  *  *, no rate determined under the provision of this section upon such articles shall exceed the maximum ad valorem rate so specified.

Having expressly excepted from the operation of section 315 *maximum* ad valorem rates of duty provided for in the Tariff Act of 1922, it may be presumed that, if the Congress intended to except *minimum* rates from the operation of those provisions, it would have said so. We are of opinion, therefore, that the Congress did not intend to except so-called minimum ad valorem rates of duty from the operation of the provisions in question.

It is contended by counsel for importer that the report of the Tariff Commission to the President establishes that neither the commission nor its investigators were of opinion that the cost of production of cheese in Switzerland had been ascertained by the commission's investigation, and that, therefore, no lawful investigation had been made. Based upon this hypothesis, it is argued that the proclamation of the President was premature and, therefore, contrary to the express provisions of section 315.

Section 315 provided that "no proclamation shall be issued under this section" until an investigation to—

*assist the President in ascertaining differences in costs of production* * * * shall be made by the United States Tariff Commission * * *. (Italics ours.)

Such an investigation by the Tariff Commission was required in order to give the President authority to act under those provisions. However, the statute did not provide that the Tariff Commission should fix the duties, nor that it should make findings upon which proclamations of the President should be based. The findings contemplated by the statute were to be made by the President. *Hampton, Jr., & Co. v. United States, supra.*

The statute provided that the Tariff Commission should make an investigation and give reasonable public notice of its hearings and reasonable opportunity to interested parties to be present, to produce evidence, and to be heard. But, in the final analysis, the duty devolved upon the President to make the findings contemplated by the statute, and it is immaterial what opinions were entertained by the investigators, or by the members of the Tariff Commission, as a result of such an investigation. There being no claim that the investigation was illegal for any other reason, we must hold that the court below did not err in rejecting the report of the commission.

It is argued by counsel for the Government that neither the court below nor this court has authority to review the acts of the President or those of the Tariff Commission, "inasmuch as the Congress did not expressly so provide." Although many cases are cited by counsel for the Government which, it is claimed, support this view and also hold that the statements contained in the proclamation of the President were final and conclusive, we deem it unnecessary to enter upon a discussion of them here.

Section 315 provided positively that no proclamation should be issued by the President under the provisions in question until an investigation had been made by the Tariff Commission. A legal investigation by the Tariff Commission was a condition precedent to the issuance of a lawful proclamation by the President. *Hampton, Jr., & Co.* v. *United States, supra; Union Bridge Co.* v. *United States,* 204 U. S. 364; *William A. Foster & Co. (Inc.) et al.* v. *United States,* Suit No. 3458, 20 C. C. P. A. (Customs) 15, T. D. 45673, and *Norwegian Nitrogen Products Co.* v. *United States,* Suit No. 3454, 20 C. C. P. A. (Customs) —, T. D. 45674, decided concurrently herewith.

Accordingly, if the President had increased the rates of duty provided in paragraph 710 without a legal investigation by the Tariff Commission, the assessment by the collector of such duties might be challenged by protest, and the court below, and, on appeal, this court, have authority to determine the issues raised thereby. The Congress, of course, contemplated that the Tariff Commission would make full, fair, and impartial investigations to the end that the President might be fully advised and the purposes of the law consummated. Nevertheless, neither the Customs Court nor this court was given authority to revise the proceedings of the commission, or to control the scope of its investigations. However, the Customs Court, and, on appeal, this court have authority to review those proceedings for the purpose of determining whether a legal investigation had been made. *William A. Foster & Co. (Inc.) et al.* v. *United States, supra; Norwegian Nitrogen Products Co.* v. *United States, supra.*

Holding these views, we deem it unnecessary to discuss other issues raised by counsel for the parties. The judgment is *reversed.*

LENROOT, Judge, did not participate in this case.